ORIGINAL                                                    ORIGINAL

1  **Robert J. Beles** Bar No. 41993
   **Paul McCarthy** Bar no. 139497
2  One Kaiser Plaza, Suite 2300
   Oakland, California 94612
3  Tel No. (510) 836-0100
   Fax. No. (510) 832-3690
4
   Attorneys for *Petitioner*
5

6

7

8
                    𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔠𝔬𝔲𝔯𝔱
9                       𝔑𝔬𝔯𝔱𝔥𝔢𝔯𝔫 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔠𝔞𝔩𝔦𝔣𝔬𝔯𝔫𝔦𝔞

10
    JARVIS GILBERT,                          No. **07-05987-TEH**
11
                    *Petitioner*,            PETITION FOR WRIT OF HABEAS CORPUS;
12        vs.                                VERIFICATION; MEMORANDUM OF
                                             POINTS AND AUTHORITIES
13  TOM FELKER, Warden, High Desert
    State Prison
14
                    *Respondent.*
15
    PEOPLE OF THE STATE OF CALIFORNIA,
16
                    *Real Party in Interest.*
17

18              **PETITION FOR WRIT OF HABEAS CORPUS**

19                          **VERIFICATION**

20          **MEMORANDUM OF POINTS AND AUTHORITIES**

21

22

23

24

25

26

27

28

ORIGINAL                                                    ORIGINAL

# TABLE OF CONTENTS

*item*                                                    *page number*

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PETITION FOR WRIT OF HABEAS CORPUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    1. Statement of Custody. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    2. Jurisdiction and Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    3. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

        a. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

        b. Testimony of Lache Rodriguez. . . . . . . . . . . . . . . . . . . . . . . . . . .  p-2

        c. Testimony of James Holloway. . . . . . . . . . . . . . . . . . . . . . . . . . .  p-3

        d. Testimony of Sergeant Cronin, Sjoberg, and Inspector Williams. . . . . . . .  p-3

            i. Sergeant Cronin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-3

            ii. Inspector Williams. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-4

            iii. Deputy district attorney Sjoberg. . . . . . . . . . . . . . . . . . . . . . . .  p-4

        e. Defense witnesse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-5

        f. Closing argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-6

            i. Prosecutor's closing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-6

            ii. Defense closing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-7

            iii. Prosecution's rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-7

        g. Jury deliberations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-9

        h. State appellate review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-9

    4. Summary of Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-9

    5. Need for habeas remedy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-11

    6. Need for evidentiary hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-11

**VERIFICATION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-12

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

    1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

i

ORIGINAL                                                          ORIGINAL

item                                                              *page number*

2. The prosecutor improperly presented and argued testimonial hearsay in violation of petitioner's Sixth and Fourteenth Amendment rights to confront and cross-examine witnesses.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-2

3. The prosecutor engaged in prejudicial conduct and closing argument that violated petitioner's right to a fair trial and to due process of law... . . . . . . . . . . .   m-5

    a. Vouching. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-5

    b. Referring to alleged evidence that was not a part of the record.. . . . . .   m-11

    c. Attempting to hold petitioner responsible for the general problems of society.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-11

4. Trial counsel was ineffective in failing to object to the errors described in this petition or seek appropriate relief for such errors.. . . . . . . . . . . . . . . . . . . .   m-14

5. Petitioner would be entitled to an evidentiary hearing on the issue of ineffective assistance of counsel if respondent raises a material dispute on the issue... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-14

6. Cumulative error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-19

7. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-19

ORIGINAL                                                                    ORIGINAL

# TABLE OF AUTHORITIES

cases                                                                    page number

*Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-12

*Baja v. Ducharme*, 187 F.3d 1075 (9th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . .  m-16

*Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). . . . . . . . . .  m-12

*Commonwealth of Northern Mariana Islands v. Mendiola*, 976 F.2d 475 (9th Cir. 1993). m-13

*Crawford v. Washington*, 541 U.S. 36; 124 S. Ct. 1354;
158 L. Ed. 2d 177 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    p-10, m-2, m-3, m-14

*Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). . . . . .  m-11

*Davis v. Washington*, — U.S. —, 126 S. Ct. 2266; 165 L. Ed. 2d 224 (2006) . . . . . . . .  m-3

*Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). . . .  m-11

*Douglas v. Alabama* (1965) 380 U.S. 415.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-4

*Drayden v. White*, 232 F.3d 704 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-11

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . m-16-19

*Evans v. Lewis,* 855 F.2d 631 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-14

*Hall v. United States*, 419 F.2d 582 (5th Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . .  m-10

*Hall v. Whitley*, 935 F.2d 164 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-11

*Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-14

*In re Lawler* (1979) 23 Cal.3d 190. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-18

*In re Lewallen* (1979) 23 Cal.3d 274. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-18

*Insyxiengmay v. Morgan*, 403 F.3d 657 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . .  m-16

*Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-16

*Keeney v. Tamayo-Reyes,* 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992). . . . .  m-16

*Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). . . . . . . .  m-16

Penal Code section 187. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

*People v. Donaldson* (2001) 93 Cal. App. 4th 916. . . . . . . . . . . . . . . . . .    m-6, m-7, m-14

*People v. Ledesma* (1987) 43 Cal. 3d 171. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-14

*People v. Pope* (1979) 23 Cal. 3d 412.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-14

ORIGINAL                                                                    ORIGINAL

cases                                                                    page number

*Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-17

*Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1879). . . . . . . . . . . . . . . . . . . . . m-3

*Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . m-14

*Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . m-17

*Strickland v. Washington* (1984) 466 U.S. 668, 104 S. Ct. 2052,
80 L. Ed. 2d 674. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-14, m-19

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . m-17, m-18

*Thomas v. Hubbard*, 273 F.3d 1164 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . m-19

*Townsend v Sain*, 372 US 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963). . . . . . . . . . . . m-15-18

*United States v. Berry*, 627 F.2d 193, 198 (9th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . m-9

*United States v. Brown*, 720 F.2d 1059 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . m-9

*United States v. Combs*, 379 F.3d 564 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . m-9

*United States v. Edwards*, 154 F.3d 915 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . m-7, m-8

*United States v. Garza*, 608 F.2d 659 (5th Cir. 1979).. . . . . . . . . . . . . . . . . . . . . . . . . m-10

*United States v. Kerr*, 981 F.2d 1050 (9th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . m-10

*United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . m-12

*United States v. Leon-Reyes*, 177 F.3d 816 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . m-12

*United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . m-8

*United States v. Monaghan*, 741 F.2d 1434 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . m-12

*United States v. Roberts*, 618 F.2d 530 (9th Cir.1980) cert. denied,
452 U.S. 942, 101 S. Ct. 3088, 69 L. Ed. 2d 957 (1981). . . . . . . . . . . . . . . . . . . . . . . . m-9

*United States v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . m-4, m-10

*United States v. Smith*, 962 F.2d 923 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . m-9, m-10

*United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991). . . . . . . . . . . . . . . . . . . m-12, m-13

*United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2004). . . . . . . m-8, m-9, m-12, m-13

*United States v. Young*, 470 U.S. 1, 7, 8 105 S. Ct. 1038, 4 L. Ed. 2d 1 (1985). . . . . . . . m-8

*Williams v. Taylor*, 529 U.S. 420, 146 L. Ed. 2d 435, 120 S. Ct. 1479 (2000). . . . . . . . m-16

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                                    ORIGINAL

*statutes and rules*                                              *page number*

California Rules of Court 4.551(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-18

Federal Rules of Evidence 804(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-3

Penal Code section 245(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

Penal Code section 664. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

Rule 8(a) of the Rules Governing Section 2254 Cases . . . . . . . . . . . . . . . . . . . . . . m-14

United States Constitution, Fifth Amendment, "due process". . . . . . . . . . . . . . . . p-10, m-16

United States Constitution, Fifth Amendment, "proof beyond reasonable doubt". . . . . . p-10

United States Constitution, Fourteenth Amendment, "due process". . . . . . . . . p-9, p-10, m-2

United States Constitution, Sixth Amendment, "assistance of counsel.". . . . . p-9, m-14, m-16

United States Constitution, Sixth Amendment, "confrontation". . . . . . . . . . . . . . . . . p-10

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                    ORIGINAL

### United States District Court
#### Northern District of California

| | |
|---|---|
| JARVIS GILBERT, | No. **07-05987-TEH** |
| Petitioner, | PETITION FOR WRIT OF HABEAS CORPUS |
| vs. | |
| TOM FELKER, Warden, High Desert State Prison | |
| Respondent. | |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| Real Party in Interest. | |

## PETITION FOR WRIT OF HABEAS CORPUS

Comes now petitioner, Jarvis Gilbert, and petitions for a writ of habeas corpus.

### 1. Statement of Custody

1. On August 23, 2004, following a jury trial, (CT 687) petitioner was convicted of one count of attempted murder, Penal Code section 187/664, five counts of assault with a firearm, Penal Code section 245(a)(2), and various firearms enhancements. Petitioner was sentenced on October 8, 2004 to 42 years to life in state prison. (CT 779-790.)

### 2. Jurisdiction and Statute of Limitations

2. The California Supreme Court denied review in petitioner's direct appeal on November 29, 2007. This petition is filed within one year of the denial of review and is thus timely. This court has jurisdiction.

### 3. Statement of Facts

#### a. Introduction

3. On October 12, 2002, at about 1:00 am, four individuals, while riding in a Ford Bronco in Oakland, California, were shot at twice by a carload of masked men. Only petitioner was ever charged as being involved in the shooting.

4. Two of the individuals shot at, Manuel Adrow and Fatima Robinson, did not testify at trial. James Holloway's testimony tended to undermine the prosecution's case. 14 year old

ORIGINAL                                                                ORIGINAL

Lache Rodriguez' trial testimony consisted mainly of denying statements she previously made in police interviews and claiming a lack of memory due to a later auto accident that had left her in a three-day coma. (R.T. 347.) Rodriguez' testimony was supplemented by her prior statements and the testimony of Oakland Police Sergeant Michael Cronin, Alameda County deputy district attorney Jason Thor Sjoberg, and John Williams, an investigator with the Alameda County District Attorney's office. There was no physical evidence connecting petitioner with the shooting, no apparent motive for the shooting, and no admissions or other statements from petitioner. Petitioner did not testify.

### b. Testimony of Lache Rodriguez

5. Rodriguez, who was 13 years old at the time of the shootings, had previously given two statements to Sergeant Cronin and one statement to Sjoberg. Rodriguez admitted that she had told Sergeant Cronin on November 7, 2002 that one of the gunmen was nicknamed "J-Rock" and had identified petitioner as "J-Rock" in a photo lineup. She explained that she had told Sergeant Cronin that "J-Rock" was one of the gunmen only because Fatima Robinson had told her so (RT. 351), that Sergeant Cronin had told her that photo #3 in his photo lineup was "J-Rock" (R.T. 392), and that Sergeant Cronin had directed her to mark photo 3 and write her name on the back. (Photo #3 was of petitioner.) She had seen petitioner only at the preliminary examination and at trial and did not know him. (RT. 389.) She had not seen any of the gunmen's faces because when the shooting started, she crouched down on the floor of the Bronco. (R.T. 398.)

6. Defense counsel objected to Rodriguez' testimony that Robinson had told her "J-Rock" was a gunman as "hearsay" but did not raise Confrontation Clause objections. The court allowed the testimony as evidence showing that Rodriguez remembered what Robinson had told her.(R.T. 353.)

7. Rodriguez further testified that at the time of the shootings, she had not been wearing her prescription glasses, which she needed to see properly (R.T. 419), and that she had drunk alcohol, smoked marijuana, and taken the drug "ecstasy" earlier on the night of the shootings. (R.T.364-366.)

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                                        ORIGINAL

8. Rodriguez said that Sergeant Cronin offered her $10,000 to testify. (RT. 353.). The City of Oakland apparently had offered a reward of up to $10,000 for information leading to convictions of violent crimes. (R.T. 435.) Rodriguez said she thought Sergeant Cronin had offered her the money to testify that petitioner was one of the gunmen. (R.T. 458.)

9. Rodriguez admitted that she gave her second statement to Sergeant Cronin after being arrested on a warrant for failure to appear in court, apparently as a witness in petitioner's case. She had told Sergeant Cronin that she wanted her mother present during the interview, but Sergeant Cronin had not called her mother, had handcuffed Rodriguez to a desk, and had not let her use the bathroom until she had answered his questions. (R.T. 408.)

### c. Testimony of James Holloway

10. Holloway testified (at trial and by way of his preliminary examination testimony, which was introduced at trial) that in the area where the second shooting incident occurred, there was light coming from the gas station and overhead lighting coming down on the street. Holloway has good eyesight, doesn't wear prescription lenses, and had his eyes checked less than 1 year ago. (RT. 556.) Although lighting conditions were good, the gunmen stayed in their car. Holloway heard no people in the shooters' car say anything that would identify anyone in the car, and saw no one lean out or get out of the car so that he could see them well enough to identify them. (R.T. 552.) At no time did Holloway hear any of his fellow passengers in the Bronco identify anyone in the gunmen's car. (RI 553.)

11. Holloway had heard the name "J-Rock" but didn't know the individual by sight, and thus could not have identified him even if "J-Rock" had been one of the gunmen. (RT. 554-555.)

### d. Testimony of Sergeant Cronin, Sjoberg, and Inspector Williams

### i. Sergeant Cronin

12. Sergeant Cronin testified that when talked to Rodriguez on October 12, 2002, the day of the shooting, she told him that "J-Rock" was the shooter. In her November 2002 and March 2003 interviews, Rodriguez said nothing significantly different, and she picked

p-3

petitioner's picture out of a photo lineup and identified him as "J-Rock" during the November interview. (RT 627.)

13. Sergent Cronin admitted that Rodriguez had asked that her mother be present during the March 2003 interview and that he had conducted the interview without the mother, but explained that he was not questioning Rodriguez as a criminal suspect. (RT. 670.)

14. Sergeant Cronin was familiar with petitioner based on his experiences on the street, knew that his nickname was "J-Rock" (R.T. 634), and said that the only "J-Rock" he had ever heard of was petitioner. Sergeant Cronin selected petitioner's photograph to include in the lineup because the name "J-Rock" came up, and because he knew petitioner frequented out in the area of the first shooting incident. (RI 662.) Defense counsel did not object to Cronin's testimony that he knew petitioner on the street, although this testimony implied that petitioner had committed other crimes. In response to defense counsel's questioning, however, Sergeant Cronin admitted that he had not checked the Oakland Police Department's street name database to determine whether there were any other individuals in it nicknamed "J-Rock." (RT. 660.) He said that he had not checked the database because "the witness already identified him (the petitioner) in a photo lineup." (R.T. 691.)

15. On redirect examination, the district attorney asked Sergeant Cronin which witness he was referring to. Sergeant Cronin replied that *Fatima Robinson* had identified petitioner in a photo lineup. Defense counsel did not object on hearsay or Confrontation Clause grounds, even though Robinson had not previously testified and would eventually not testify as a witness at trial. (R.T. 691.)

### ii. Inspector Williams

16. Inspector Williams was called as a witness simply to testify that Rodriguez had defecated in her pants when he had served a subpoena on her to testify as a witness, and had also said petitioner would have his people kill her if she testified. (R.T. 473.) Rodriguez had never been asked, during her testimony, whether she had defecated in her pants or made such a statement. Defense counsel did not object on hearsay or Confrontation Clause grounds, but did object on hearsay grounds when Inspector Williams testified that Rodriguez' mother also told

ORIGINAL                                                    ORIGINAL

him that petitioner would have his friends kill Rodriguez if she testified. (R.T. 511.) The court

overruled defense counsel's hearsay objection. Defense counsel did not object on Confrontation

Clause grounds. The mother was never called as a witness.

### iii. Deputy district attorney Sjoberg

17. Mr. Sjoberg was assigned to conduct the preliminary examination in petitioner's case.

(R.T. 573.) He examined Rodriguez on March 25 and 26, 2003. (RT. 574.) Although relevant

portions of the transcript of Rodriguez' preliminary examination testimony had already been

introduced into evidence, Mr. Sjoberg testified about her "demeanor" during her testimony,

saying that she was difficult, evasive, crying, and frightened on the first day of testimony, when

she was asked to identify petitioner, (RT. 577), but was merely irritated and evasive on the

second day of her testimony. (RT. 582.) Mr. Sjoberg admitted that Rodriguez had also testified

that she was high on narcotics and that everything she had told Sergeant Cronin had been told

to her by Fatima Robinson. (R.T. 583.)

18. The actual preliminary examination transcript reports that Rodriguez began crying

during the afternoon session of her first day of testimony when asked to identify petitioner, and

also cried at one other point during the afternoon session, saying someone was going to kill her.

(C.T. 17-18, 44-45.) The transcript does not report that Rodriguez appeared generally fearful

throughout the first day of her testimony, as Mr. Sjoberg had testified. Instead, it reported that

Rodriguez had repeatedly complained that Mr. Sjoberg was not "listening" to her answers to his

questions and that she had answered them before. (CT. 39, 40, 44 ("Is you saying I just pointed

him out on my own when I don't even know him?"), 80 ("as I told you once before..."), 81

("You confused? You just ain't listening. I told you..."), 98 ("I told you once before...").)

19. Mr. Sjoberg also met with Fatima Robinson in the prosecutor's office on the second

floor of the Wiley Manuel court on March 14th, and took her upstairs so that the judge would

order her to come back on March 25th. (R.T. 586.) When Sjoberg got Robinson to the

courtroom, a woman walked up to her and said something. Robinson became upset and ran

down the hall for the elevators. Sjoberg caught her, took her back down to his office, and then

upstairs via the staff elevator not accessible to the public, to the judge's chambers. (RT. 589-

ORIGINAL                                    ORIGINAL

590.) The court ordered Robinson back to court for the following Monday. She never returned to court. (RT. 590-591.) [1]

### e. Defense witnesses

20. Petitioner's sister Ursula Morris and his cousin Tiffany Bonner testified concerning a partial alibi for petitioner, but the two disagreed on whether petitioner's girlfriend, Niesha Kennedy, was present. Both Morris and Bonner testified that petitioner had accompanied them and other family members to a relative's birthday party at a Chuck E. Cheese's restaurant in Pleasanton on the evening of October 11, 2002. Bonner, however, testified that Kennedy also came to Chuck E. Cheese's; Morris testified that Kennedy's children had come, but Kennedy did not pick them up until later that evening. (RT. 701-703, 737-739 .)

21. Both Morris and Bonner agreed that they had gotten back to Oakland at about 10:00-10:15 pm. (R.T. 703, 737-739.) This was a few hours before the shootings, which occurred at about 1:00 am on October 12, 2002. At that point, Bonner was dropped off and petitioner went with Morris to her home in Oakland. (R.T. 705-706.)

22. Morris wanted petitioner to stay with her because she was 9 months pregnant and could give birth at any time. After she and petitioner got to her home, Kennedy came over to pick up her children, arriving at about 11:00 pm and staying until about 1:00 to 1:15 am.. (RT. 704.) Morris and petitioner went to bed around 1:20 am. on October 12, 2002 (RT. 707.) Both of them slept in Morris' king sized bed. Morris never saw petitioner leave that night, although she woke up many times; whenever she woke up, petitioner was still there. (RT. 708.) Petitioner did not have a car and would have had to have taken Morris' car to leave. (RT. 708, 709.) Morris' car keys were on her nightstand, but she insisted petitioner could not have taken the keys because bed is squeaky and she is not a hard sleeper. (RT. 710.) Morris saw petitioner leave about 8:45 the next morning. (R.T. 710.)

23. Jason Watts testified that he lived in West Oakland and also went by the nickname of "J-Rock", saying that people had been calling both him and petitioner "J-Rock" since they

---

[1] No independent record was introduced of this alleged running-away incident, like a court minute.

ORIGINAL                                                                    ORIGINAL

1    were children. (RT 751.)

2                              **f. Closing argument**

3                              **i. Prosecutor's closing**

4        24. The prosecution gave the following closing argument without any objection from

5    defense counsel:

6        a. Rodriguez's later statements and denials were motivated by fear and that the
     jury could infer that people had put pressure on her not to testify. (RT. 765.)
7    Expanding on this theme, the prosecutor argued that Rodriguez had experienced
     "post traumatic stress disorder" or something like battered women's or domestic
8    violence syndrome, explaining that in such conditions, the witness's statements
     taken within the first 48 hours after the stressful event were most likely to be the
9    truthful statements. After this 48 hour period, said the prosecutor, "studies show"
     that the "abuser" will come back with "gifts, apologize, maybe even cry, and tell
10   the battered person "this will never happen again." And the battered person will
     then begin to "mitigate the amount of trauma she had suffered." (RT. 771.)
11   Rodriguez' later statements (like the November 7th one, where she allegedly
     identified petitioner's picture in the photo lineup), had 'passed the 48 hours' and
12   she began complaining that she could not go to court. (RT 772.) By the time of
     her March statement to Cronin, "the intimidation factor" had taken full hold of
13   Rodriguez. (RT. 774.) No expert testimony had been presented at trial to support
     the prosecutor's argument about post traumatic stress disorder or battered
14   women's syndrome. There was no evidence that Rodriguez had been battered, or
     that anyone had offered her gifts not to testify. (The only evidence of gifts was
15   Cronin suggesting that she could possibly obtain a reward for testifying.)

16       b. Sergeant Cronin testified that Fatima Robinson identified petitioner in the
     photo lineup as one of the gunmen. (R.T. 773.)

17

18       c. After Watts had testified, he had gone to sit with petitioner's family members
     in the audience. This was not a matter of record, and defense counsel objected,
19   albeit on "hearsay" grounds. The court advised the jury that they were the
     exclusive judges of what is in evidence and what is not in evidence. (RT. 775,
20   783.) The prosecutor similarly argued that when Holloway came through the
     courtroom door, he never took his eyes off the right side of the courtroom where
21   petitioner's family was seated. This was similarly not a matter of record. (RT.
     776.) The prosecutor also argued that the "courtroom atmosphere" had
22   intimidated Holloway so that he would not provide useful testimony. (RT. 780.)
     The actual record does not report any outbursts, admonishments of the audience,
23   or any other events showing an intimidating "courtroom atmosphere" during
     Holloway's testimony.

24       d. Because Morris and Watts disagreed about whether Kennedy had gone to
     Chuck E. Cheese's or not, neither witness was believable; therefore defendant
25   must be guilty. (R.T. 784.)

26                              **ii. Defense closing**

27       25. Defense counsel argued, among other things, that the jury should not believe

28   Inspector Williams' testimony that Rodriguez had defecated on herself when he served a

subpoena on her. Rodriguez was an emancipated, street-wise minor who would not have engaged

in such behavior in front of her friends.. (R.T. 779.)

iii. <strong>Prosecution's rebuttal</strong>

26. The prosecution gave the following rebuttal argument without any objection from

defense counsel:

a. The prosecutor treated defense counsel's argument that Inspector Williams had not been truthful as an attack on the district attorney's office and himself:

> "I want to talk about what I told you would happen and what did indeed happen when I first talked to you in opening statements about this case, and that is, namely, the fact that defense and the witnesses would say anything, attack credibility of police officers, of the District Attorney's office, the District Attorney inspectors in an attempt to get you to focus off of the true facts of this case, and focus on perhaps some other reasons looking at police or other aspects....

> "...you know, I told you that the defense is going to attack me and say things about me, and I'm not going to respond to those....""

(R.T.824, emphasis added.) The prosecutor had not actually made any such predictions in his opening statement.

b. The prosecutor then argued that Inspector Johnson would not lie because he is an inspector "with the District Attorney's office":

> "Lastly, on this issue of attacking law enforcement. Mr. Johnson -- I admire his candor, because he comes straight out. He does not believe Inspector Williams from our office. He basically says Inspector Williams says he's lying when he says Lache Rodriguez defecated on herself when he went to serve the subpoena. I admire that from Mr. Johnson, that he will say that straight out, and he's entitled to his opinion. But ladies and gentlemen, let me ask you, why would an inspector *with the District Attorney's office* with ten years background in law enforcement and *a good job here in the District Attorney's office*, get on the stand and commit perjury; put his entire profession on the line and everything that he's worked for on the line for that, for that lie? I mean, if he's going to do it, if he's going to say that or if he's going to make up a lie, why not instead say when I picked up Lache Rodriguez she said, yeah, I saw J-rock do it. I was there. I saw everything, but you are never going to get me to talk to you, Cop. You can take me in, but I'm going to get up there and I'm going to tell the jury all this." Why say she defecated on herself? Why not for that matter say she peed on herself or urinated? There's no reason, no motive at all for Inspector Williams to say anything but the truth."

(R.T. 838-839, emphasis added.)

c. The prosecutor then personally vouched for the reliability of Inspector

p-8

Williams' testimony by informing the jury that he had personally reviewed it:

> "And the whole incident, quite frankly, when he told me, I was thinking, you got to be kidding. You are kidding about that, making some sort of sick joke about the poor little girl. No, that's what happened. You are willing to go on the stand under oath, if I need you to tell that? You don't make that stuff up, ladies and gentlemen."

(R.T. 839.)

d. The prosecutor again mentioned Sergeant Cronin's statement that Robinson had identified petitioner in the photo lineup, calling it the "strongest evidence" in the case, along with Rodriguez' identification of petitioner. (RI 834.)

e. The prosecutor compared petitioner, an African American, to the Ku Klux Klan and other white supremacists in the South, as well as to Chinese mobsters in San Francisco's Chinatown:

> "It's very much like in the deep south, when African-Americans were intimidated, cajoled, hurt violently into keeping silent to deny them the right to vote, to deny them their basic civil rights. They are -- the criminals that ruled them that kept them under their thumb through fear were white supremacists. Segregationists. People who said you are not going to be able to exercise your rights. And the people in the south did not say, "We don't trust the system." They said, "The system cannot protect us." You workers from the north could come down here and could tell us that we have the right to vote, that we have the right to be equal,, but you come down here and you register us and you get us organized and then you leave and we live here. And we go back to our houses, and we are the ones that get fired on. We are the ones who get lynched, because these criminals, they are the ones that control our lives. We live under a blanket of fear, and we live under a blanket of silence...."

> ...In Chinatown in San Francisco to this very day, even two years ago during Chinese New Year, the mobs that run Chinatown, that run large sections of Chinese enclaves in Oakland and San Francisco, they have a tradition, Chinese New Year. Chinese people give people -- each other red envelopes, fruit trees, oranges, tangerines as a symbol of prosperity and good luck. And the mob in Chinatown would come with a kumquat plant and present it to the small business owners, and say, "This is for the health and prosperity of your business, and in return we would like a small donation." Two years ago, two businesses in the Richmond District of San Francisco refused to give this donation for their prosperity and their buildings were fired on and the businesses were burned."

(RT 841-842.)

## g. Jury deliberations

27. The jury deliberated for the afternoon of August 18, 2004, a Wednesday. (R.T. 857-888.) During the morning session of August 19, 2004, in response to a request by the jury, the

p-9

court had Holloway's testimony read back to them. (R.T. 889.) At the end of the afternoon session of August 19, 2004, the court recessed the jury until the following Monday, August 23, 2004. The jury returned their guilty verdict during the morning session of August 23, 2004. (R.T. 891.)

### h. State appellate review

28. Petitioner filed a direct appeal and companion state habeas corpus proceeding in the California Court of Appeal for the First Appellate District. The Court of Appeal affirmed petitioner's conviction and denied the companion habeas corpus petition. The California Supreme Court denied review on November 29, 2007.

### 4. Summary of Claims for Relief

29. Defense counsel ineffectively assisted petitioner in violation of petitioner's right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments by failing to make the proper objections or seek appropriate relief in response to the following conduct by the prosecution:

a. Calling an Alameda County District Attorney who had actively prosecuted petitioner's criminal case to testify as a prosecution witness.

b. Calling an investigator who worked for the Alameda County District Attorney's office to testify about a witness' alleged reaction when served with a subpoena.

c. Eliciting testimony from Sergeant Cronin that a witness never made available for cross-examination, Fatima Robinson, had made an out of court identification of petitioner as one of the gunmen, and arguing this out of court identification during closing.

d. Eliciting testimony from Inspector Williams that Rodriguez' mother, also a witness never made available for cross-examination, had told him petitioner would have his friends kill Rodriguez if she testified.

e. Prosecutorial closing argument that warranted the testimony of at least one witness, an investigator from the district attorney's office.

f. Prosecutorial closing argument urging the jury to convict petitioner to convict a criminal defendant "to protect community values, preserve civil order, or deter future lawbreaking." *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994).

g. Prosecutorial closing argument arguing the existence of "facts" not a part of the record, or asking the jury to draw conclusions from matters that were not a part of the record, such as what a witness allegedly did after he finished testifying.

h. Prosecutorial closing argument stating that if the jury disbelieved petitioner's

ORIGINAL                                                                    ORIGINAL

1    alibi witnesses, it would have to convict petitioner.

2        30. The errors also constituted "plain error" under California law, rendering them

3    cognizable even in the absence of a showing of ineffectiveness.

4        31. All of the errors set forth in paragraph 29 deprived petitioner of due process of law

5    and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution.

6    Errors 29(c) and (d) also violated petitioner's right to confront and cross examine witnesses

7    under the Sixth and Fourteenth Amendments to the United States Constitution, as interpreted

8    by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36; 124 S. Ct. 1354; 158 L. Ed. 2d

9    177 (2003). Error 29(h) also misstated the prosecution's burden to prove its case beyond a

10   reasonable doubt and improperly shifted the burden of proof to petitioner, in violation of

11   petitioner's right not to be convicted except by proof beyond a reasonable doubt under the Fifth

12   and Fourteenth Amendments to the United States Constitution.

13       32. Petitioner is prejudiced. Absent the errors set forth here, a reasonable juror could have

14   found a reasonable doubt of petitioner's guilt.

15                              **5. Need for habeas remedy.**

16       33. Petitioner presents this petition to this court as an original proceeding in habeas

17   corpus. Petitioner has no other plain, speedy, or adequate remedy at law.

18                              **6. Need for evidentiary hearing**

19       34. Petitioner does not know yet whether respondent will dispute his contention that

20   defense counsel's conduct fell below an objective standard of reasonableness. Petitioner's position

21   is that any attempt by respondent to propose "legitimate tactical reasons" for defense counsel's

22   acts and omissions that are not based on evidence showing that defense counsel actually relied

23   on such reasons would be insufficient to raise a material evidentiary dispute concerning this issue,

24   and that, in such event, this court would have to conclude that defense counsel had no legitimate

25   tactical reasons for his acts and omissions. Should respondent present evidence that defense

26   counsel actually relied on certain tactical reasons, and not just argument that defense counsel

27   could have relied on such reasons, or should the court conclude that argument that defense

28   counsel could have relied on such reasons is sufficient to raise a material evidentiary dispute

concerning the issue, petitioner would be entitled to an evidentiary hearing on the issue of the ineffectiveness of trial counsel, because he did not have a reasonable opportunity to obtain an evidentiary hearing in the state court proceedings.

### 7. Relief requested

Wherefore, Petitioner respectfully requests that this court, following briefing on the merits: (a) hold an evidentiary hearing on any disputed issues of material fact, if any, (b) issue a writ of habeas corpus, and (c) grant whatever further relief is appropriate.

Dated: Oakland, California, Monday, November 26, 2007.

**Robert J. Beles**
Paul McCarthy
Attorneys for Petitioner

### VERIFICATION

Petitioner is in custody and incarcerated outside the County of Alameda. I therefore verify the petition on his behalf. I declare under penalty of perjury that the facts set forth in this petition are true and correct based on my review of the record. Executed in Oakland, California, on Monday, November 26, 2007.

**Paul McCarthy**
Declarant

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                                                    ORIGINAL

1

# United States District Court
## Northern District of California

2

3  JARVIS GILBERT,                              No. **07-05987-TEH**

4               *Petitioner*,                    MEMORANDUM OF POINTS AND
        vs.                                      AUTHORITIES
5

6  TOM FELKER, Warden, High Desert
   State Prison

7               *Respondent*.

8  PEOPLE OF THE STATE OF CALIFORNIA,

9               *Real Party in Interest*.

10

11                    **MEMORANDUM OF POINTS AND AUTHORITIES**

                                **1. Introduction**

12

13        During the early morning hours of October 12, 2002, a group of individuals fired shots

14  into a car occupied by Manuel Adrow, Fatima Robinson, Larche Rodriguez and James Holloway.

15  The four picked up a fifth individual, Lester Williams, nicknamed "Mookie", who was

16  apparently an older person with some authority in the neighborhood. A while later, after the

17  group had gone to two gas stations, a group of individuals again fired shots into the car. The

    shooting stopped when Williams jumped out of the car and identified himself as "Mookie."

18

19        Of these five individuals, the thirteen year old Rodriguez was the only one who, in court,

20  suggested that petitioner was one of the gunmen. There was no evidence about who the other

21  gunmen might have been, and no evidence showing why Ms. Rodriguez would have been able

22  to identify petitioner but no one else. Very little evidence was offered about what the other

23  gunmen looked like or even what petitioner allegedly looked like that evening. No evidence was

24  presented about why the gunmen might have wanted to shoot at any of the five individuals. In

25  addition, Ms. Rodriguez did not identify petitioner as one of the gunmen at trial, but only during

    the preliminary examination.

26

27        There was no circumstantial evidence suggesting that petitioner was one of the gunmen.

28  The entire case turned on the very weak testimony and identification by Ms. Rodriguez.

**2. The prosecutor improperly presented and argued testimonial hearsay in violation of petitioner's Sixth and Fourteenth Amendment rights to confront and cross-examine witnesses.**

In *Crawford v. Washington*, the Supreme Court established a bright line rule barring introduction of "testimonial hearsay" at trial unless the defense had had a prior opportunity to cross-examine the source of the hearsay. In *Crawford*, the defendant was charged with stabbing a victim. Defendant contended that his wife, Sylvia, had told him that the victim attempted to rape her, defendant confronted the victim, a fight ensued, and defendant stabbed the victim in self-defense because he thought the victim was drawing a weapon. *Crawford v. Washington*, 541 U.S. at 39; 124 S. Ct. at 1357; 158 L. Ed. 2d at 185. Sylvia was interrogated by the police and gave a statement that suggested that the victim had not drawn a weapon before being stabbed:

> "[The victim] lifted his hand over his head maybe to strike [defendant's] hand down or something and then he put his hands in his . . . put his right hand in his right pocket . . . took a step back . . . [Defendant] proceeded to stab him . . . then [the victim's] hands were like . . . how do you explain this . . . open arms . . . with his hands open and he fell down . . .(describing subject holding hands open, palms toward defendant)."

When asked if she had seen anything in the victim's hands, Sylvia answered "um-um" (indicating "no".) *Crawford v. Washington*, 541 U.S. at 39-40; 124 S. Ct. at 1357; 158 L. Ed. 2d at 185.

At trial, defendant asserted the marital privilege and Sylvia did not testify. The prosecution introduced Sylvia's out of court statement. Defendant was convicted. The U.S. Supreme Court held that her statement to the police constituted "testimonial hearsay" that could not be introduced at trial absent a prior defense right to cross-examine. Although the Court did not fully delineate the scope of such "testimonial hearsay", it held that at its core were statements taken by police officers in the course of interrogations:

> "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function... The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace."

*Crawford v. Washington*, 541 U.S. at 52, 124 S.Ct. at 1364-5, 158 L.Ed.2d at 193-4.

ORIGINAL                                                    ORIGINAL

Fatima Robinson's alleged identification of petitioner, in Sergeant Cronin's photo lineup, as one of the gunman, was undeniably "testimonial hearsay" under *Crawford v. Washington*, arguably even closer to the "core" than the hearsay in *Crawford*. Robinson's alleged identification was a statement acquired during a police interrogation conducted as part of the investigation of a crime, implicating petitioner as a participant in the crime. *Davis v. Washington*, — U.S. —, 126 S. Ct. 2266; 165 L. Ed. 2d 224 (2006) holds no differently – Robinson's alleged identification of petitioner in a photo lineup was hardly the product of an informal field interview during an exigency. Robinson had not previously testified at the preliminary examination and there had never been any defense opportunity to cross-examine her. *Crawford v. Washington* had been decided in November of 2003, nearly a year before petitioner's trial, and obviously applied.

Inspector Williams' testimony about Rodriguez' mother's statement that petitioner and his friends would kill Rodriguez if she testified was similarly testimonial hearsay, the product of law enforcement investigation of a pending prosecution. Inspector Williams had elicited this statement in response to his asking the mother where Rodriguez was so that he could serve a subpoena.

Introduction of Robinson's identification could not have been allowed on the theory that petitioner had procured her absence at trial, as suggested in *Davis v. Washington*, 126 S. Ct. 2266 at 2280 or in *Reynolds v. United States*, 98 U.S. 145, 158-159, 25 L. Ed. 244 (1879). Although this possible exception to *Crawford* has not been fully described in the decisional law, the version codified in Federal Rules of Evidence 804(b)(6) requires a showing that the defendant "has engaged or acquiesced in wrong-doing that was intended to, and did procure the unavailability of the declarant as a witness." In *Reynolds*, the source of the proposed exception, the defendant, in a bigamy trial, procured his second wife's absence as a witness with the intent that she not testify at trial by telling her to evade the marshall's subpoena. There was no similar showing here. The closest thing to a showing was deputy district attorney Sjoberg's testimony that when he had brought Robinson to court, a woman said something to Robinson that caused her to run away. However, Sjoberg did not hear what the woman said, the woman was never

identified, and there was no evidence that, whatever the woman had said to Robinson, petitioner had put her up to it.

There was no evidence presented that anyone had procured Rodriguez' mother's absence at trial or that her absence was anything but a conscious decision by the prosecution.

The record shows that Sergeant Cronin's statement concerning Robinson's identification was not the product of defense questioning, but rather evidence deliberately elicited by the prosecution. In response to a question by the defense about why he had not checked a police database of street names, Sergeant Cronin replied that that "the witness already identified him in a photo lineup." (R.T. 691.) Sergeant Cronin's use of the phrase "the witness" would have appeared to the jury to refer to Lache Rodriguez, who had testified as a witness and had picked out petitioner's photo in a lineup, although she later claimed she only did so in response to Cronin's prompting. Only when the prosecutor directly asked Sergeant Cronin to identify the individual he had been referring to did Cronin testify that Rodriguez had identified petitioner. The prosecutor's conduct was similar to the impermissible and unconstitutional conduct of the prosecutor in *Douglas v. Alabama* (1965) 380 U.S. 415, 419, who, under the guise of refreshing the recollection of the defendant's accomplice, read from his "confession" a statement implicating the defendant. See also *United States v. Sanchez*, 176 F.3d 1214, 1221 (9th Cir. 1999) (the prosecutor, knowing that defendant's wife's statement to federal marshals was inadmissible, put the statement before the jury under the guise of cross-examination of the defendant.) Inspector Williams' statement was elicited on initial direct examination.

Introduction of Robinson's alleged identification of petitioner obviously prejudiced petitioner. This court need only look to the prosecution's own assessment of it during closing argument, when he characterized it as one of the two most important items of evidence in his case, along with Lache Rodriguez' identification of petitioner. Indeed, Robinson's out of court identification of petitioner probably had even greater weight than Rodriguez'. Robinson was never cross-examined. Rodriguez, a 14 year old, was extensively cross-examined and shown to be less than reliable. Introduction of Rodriguez' mother's statement was prejudicial to a lesser extent, and the denial of cross-examination was prejudicial, since the mother was not an obvious

witness to anything and could well have admitted that she had no personal knowledge of any supposed plans by petitioner or anyone else to kill Rodriguez if she testified.

### 3. The prosecutor engaged in prejudicial conduct and closing argument that violated petitioner's right to a fair trial and to due process of law.

#### a. Vouching

The prosecution presented two witnesses employed by his own office, one of whom was Sjoberg, a prosecutor who had actively prosecuted the case against petitioner. Sjoberg's testimony appeared entirely irrelevant and gratuitous, suggesting that Sjoberg had testified simply to cast the prosecutor's office as a witness as well as an advocate.

Sjoberg's testimony about Robinson's running away from court could have been relevant if she had testified, to explain a fearful demeanor, but Robinson never testified, and there was no evidence that petitioner had procured her absence. Sjoberg's testimony about Rodriguez' alleged demeanor during her preliminary examination was inaccurate and improper, since her testimony had been transcribed and Sjoberg's opinion concerning Rodriguez' demeanor was either cumulative or not a part of the official record. It was simply a way of presenting prosecutorial argument and opinion as if it was evidence.

Inspector Williams was called on the distasteful and dubious point of showing that Rodriguez had defecated in her pants when he served a subpoena on her, apparently to show that she was afraid to go to court to testify. Ms. Rodriguez was never asked if this occurred, there were no other witnesses to this, and evidence of Ms. Rodriguez' fear of testifying was cumulative, as she had stated this during the preliminary examination. As with Sjoberg, it appears that the primary purpose of having Inspector Williams testify was to bolster the case by having witnesses associated with the district attorney's office testify.

The danger of this strategy became apparent when defense counsel challenged the accuracy of Inspector Williams during closing argument, provoking an absolutely overreaching episode of witness "vouching" from the prosecutor, who argued that Williams would not lie because he worked for the District Attorney's office:

"...why would an inspector with the District Attorney's office with ten years background in law enforcement and a good job here in the District Attorney's

ORIGINAL                                                                ORIGINAL

office, get on the stand and commit perjury; put his entire profession on the line
and everything that he's worked for on the line for that, for that lie?"

(RT 838-839.) The prosecution used the defense disbelief of Inspector Williams to vouch for

Sjoberg's testimony as well, arguing that the "defense ... would say anything, attack credibility

of ... the District Attorney's office... in an attempt to get you to focus off of the true facts of this

case." (RT 824.) In doing so, the prosecution made the issue the good faith of the district

attorney's office in bringing the case the issue, rather than the strength of the evidence against

petitioner.

"Vouching" ordinarily involves implied testimony by the prosecution that a witness is

credible, but the prosecutor here offered his explicit testimony by arguing that he perrsonally

reviewed the statement with Inspector Williams and found it credible before presenting it:

"And the whole incident, quite frankly, when he told me, I was thinking, you got
to be kidding. You are kidding about that, making some sort of sick joke about the
poor little girl. No, that's what happened. You are willing to go on the stand
under oath, if I need you to tell that? You don't make that stuff up, ladies and
gentlemen."

(RT. 839.) Not even Inspector Williams had testified to the prosecutor's personal involvement

in guaranteeing the reliability of his testimony.

"Vouching" is closely related to the improper testimony of a prosecutor as a witness who

has been involved in the active prosecution of the case. *People v. Donaldson* (2001) 93 Cal. App.

4th 916, involved explicit prosecutorial testimony vouching for the credibility of a prosecution

witness's out of court statements. The prosecution witness had told a dispatcher, the police, and

a TV news crew that she had seen defendant trying to smother her baby with a pillow. At trial,

however, the witness testified that she was just repeating things others had told her. The

prosecutor then asked the witness about a conversation the prosecutor and the witness had had

in the courthouse hall, in which the prosecutor had told the witness that she had an obligation

to testify truthfully and warned her that there were "consequences" if the witness did not testify

truthfully. The witness agreed that such a conversation had occurred. The prosecutor then had

another attorney from her office "stand in", took the stand as a witness, and testified that she

had told the witness these things, but had not told the witness that she had to testify consistently

with the police reports. The prosecutor resumed her role as prosecutor and during closing

argument, remarked:

> "I said it on the stand, but now I will say it to you as arguing this case, I believe, based on the same evidence that is before you in this case, that this woman placed that pillow over her baby's head on April 30[th]."

*People v. Donaldson*, 93 Cal. App. 4th at 926. The California Court of Appeal noted:

> "...the prohibition against a prosecutor's acting as both advocate and witness addresses 'the concern that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors."

*Id.* at 927.

The Court of Appeal relied on *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir.

1998). In *Edwards*, the police responded to a domestic dispute. Defendant's girlfriend told the

police that defendant had hit her on the head and then left the house with a gun and a black bag.

The police also apprehended defendant, who was pulling out of the driveway when they arrived,

searched the car's trunk, and found a black bag of cocaine.

At trial, however, defendant's girlfriend refused to testify, and without her statement, "the

prosecution had only circumstantial evidence tying Edwards to the black nylon bag - his

fingerprints were not found either on the bag or on its contents." *United States v. Edwards*, 154

F.3d at 918. On the first day trial, when the bag of cocaine was introduced, the officer testified,

in response to defense questioning, that he had found nothing in the bag showing that defendant

was the owner. That evening, however, the prosecutor told defense counsel that he had looked

under the piece of cardboard that supported the bottom of the bag, in the presence of two

officers, and found a bail receipt in defendant's name. Defense counsel objected to this evidence,

stating that whether the prosecutor testified or not, he would be in the position of a silent

witness vouching for the authenticity of the bail receipt. *United States v. Edwards,* 154 F.3d at

919.

As it turned out, the prosecutor did not personally testify. However, the two officers

testified that the prosecutor had found the bail receipt in the bag in their presence, and at the

prosecutor's prompting, testified that neither they nor the prosecutor had planted the bail

receipt. During closing argument, the prosecutor repeatedly argued that the jury should accept

the legitimacy of the receipt and his discovery of it.

The Ninth Circuit reversed. The court noted the close relationship between the

"vouching" and "advocate witness" prohibitions, and held that even though the prosecutor did

not personally testify, by remaining in the case, he personally vouched for the accuracy of the

bail receipt's discovery.

> "From the cases on vouching and the advocate-witness problem, it is clear that
> both of these rules were designed to prevent prosecutors from taking advantage
> of the natural tendency of jury members to believe in the honesty of lawyers in
> general, and government attorneys in particular, and to preclude the blurring of
> the "fundamental distinctions" between advocates and witnesses.... Once the
> members of the jury learned that the prosecutor found the receipt, it is almost
> certain that they attributed the authority of the prosecutor's office to the receipt's
> discovery. Moreover, by putting witnesses on the stand and having them testify
> regarding the circumstances under which he found the evidence, the prosecutor
> implicitly and improperly vouched for the accuracy of their testimony."

United States v. Edwards, 154 F.3d at 922. Even though he didn't personally testify, the

prosecutor's involvement "necessarily advised the jury that he personally believed, based on his

own observations, that the receipt had not been planted - he was there, he saw the bag, he saw

the crumpled up piece of paper lodged underneath the cardboard bottom, he knew somehow

that the bag had not been tampered with." This vouching, held the Ninth Circuit, affected the

"fundamental fairness" of defendant's trial. United States v. Edwards, 154 F.3d at 917, 921,

citing United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991).

In the case below the trial prosecutor did not personally testify. However, as in Edwards,

he argued his own participation in assuring that Inspector Williams' testimony was truthful.

Moreover, Mr. Sjoberg, the prosecutor who testified on the witness stand, was not merely a

member of the Alameda County District Attorney's Office who had incidently witnessed an event

relevant to the case. Sjoberg had participated in the very same prosecution as the government's

representative at appellant's preliminary examination.

The prohibition against "vouching" "arises from the defendant's broad right to a 'fair

trial' guaranteed by the Due Process Clause." United States v. Weatherspoon, 410 F.3d 1142,

1152 (9th Cirl. 2004), Trott, concurring, citing United States v. Young, 470 U.S. 1, 7, 84 L. Ed.

ORIGINAL                                                                    ORIGINAL

2d 1, 105 S. Ct. 1038 (1985), *United States v. Combs*, 379 F.3d 564, 574 (9th Cir. 2004),

"Vouching" occurs when the prosecutor suggests to the jury that "evidence not presented to the

jury, but known to the prosecutor, supports the witness' testimony, or when the prosecutor's

argument invites the jury "to trust the Government's judgment rather than its own view of the

evidence." *Id.* A prosecutor may not argue "that the Government has taken steps to assure the

[**41] veracity of its witnesses" or "put its own prestige behind the witness." *United States v.*

*Brown*, 720 F.2d 1059, 1073 (9th Cir. 1983), citing *United States v. Berry*, 627 F.2d 193, 198

(9th Cir.1980) and *United States v. Roberts*, 618 F.2d 530 (9th Cir.1980) cert. denied, 452 U.S.

942, 101 S. Ct. 3088, 69 L. Ed. 2d 957 (1981).

In *Weatherspoon*, the case turned on the credibility of two police officers who had taken

statements from witnesses inculpating defendant. The prosecutor argued:

> "They had no reason to come in here and not tell you the truth. And they took the
> stand and they told you the truth. I guess, if you believe Mr. Valladeres [defense
> counsel], they must have lied at the scene there; they came into this court and they
> lied to you; they lied to this judge; they lied to me; they lied to my agent, Agent
> Baltazar. I guess they lied to the dispatcher when they called it in. These are
> officers that risk losin' their jobs, risk losin' their pension, risk losin' their
> livelihood. And, on top of that if they come in here and lie, I guess they're riskin'
> bein' prosecuted for perjury. Doesn't make sense because they came in here and
> told you the truth, ladies and gentlemen."

*United States v. Weatherspoon*, 410 F.3d at 1146. The Ninth Circuit found the argument "clearly

improper", citing *United States v. Combs*, 379 F.3d 564 (9th Cir. 1994), in which the prosecutor

had argued that a testifying agent would not lie on the stand because he would be fired for

committing perjury (an argument very similar to the prosecutor's argument here that Inspector

Williams would not jeopardize his job with the district attorney's office.)

In *United States v. Smith*, 962 F.2d 923 (9th Cir. 1992), the Ninth Circuit found the

following argument to be impermissible vouching:

> "Mr. Waterman implies that George Brown got up here and said whatever he
> wanted to say and that the prosecution wouldn't prosecute him for perjury, not
> if he brought him a conviction. Well, that's absurd. My job is to guarantee a fair
> trial. If any witness commits perjury on the stand it's my job to seek an indictment
> against him if I can prove it."

> ...the government's job is to find the truth, to ferret through all this confusion, to
> ferret through all the smoke screens and lead you to the truth.

ORIGINAL                                                                    ORIGINAL

...If I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen."

*United States v. Smith*, 962 F.2d at 927. The court held:

"The cumulative effect of these statements was to submit the prosecutor's personal conviction of Smith's guilt, together with the government's as a whole, as factors for the jury to consider in its deliberations along with the actual evidence. Because of the unique power that attends the prosecutor's special role, that is something he may not do. *United States v. Garza*, 608 F.2d 659, 665 (5th Cir. 1979). "'The prosecutor may neither dispense with the presumption of innocence nor . . . sit as a thirteenth juror.'" Id. (quoting *Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969))."

*Id.*

See also *United States v. Kerr*, 981 F.2d 1050, 1052-3 (9th Cir. 1992) (held impermissible vouching, when the prosecutor argued, concerning statements of codefendants who pled guilty and testified for the government,

"it is going to come down to your judging the credibility of each one of those four individuals. Were they hoodwinking [DEA Agent] Mr. Zarndt when *I* sat there on part of the interviews, were they hoodwinking *me*, were they hoodwinking the Court, when the Court accepts their plea agreements when they agreed to cooperate?"

And see also *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (prosecutor argued that "the reputation of the Department of Justice would be put on the line to solicit false testimony just to prove up a case against these two defendants.")

In the present case, the prosecutor's vouching for the credibility of Inspector Williams was far more egregious than any of the above cases. He didn't merely give a personal guarantee that Williams was credible – he guaranteed that Williams was credible *because he was a member of the district attorney's office,* a fact which the prosecutor repeated twice, shortly after he told the jury that the "defense ... would say anything, attack credibility of ... the District Attorney's office... in an attempt to get you to focus off of the true facts of this case." This argument, in short, made the issue not Williams' credibility but the good faith of the prosecutor's office in bringing the case. This is clear because, immediately after personally guaranteeing Williams' credibility, the prosecutor related his own efforts to assure that Williams' testimony was truthful.

Williams' testimony directly concerned the credibility of Ms. Rodriguez' early statements to the police, which the prosecution's case turned on. Inspector Williams offered a very graphic

example of Rodriguez' fear, and reason for recanting her previous statements at trial – that she was so afraid of testifying against petitioner that she defecated in her pants simply upon being served with a subpoena. In this situation, the prosecutor's improper vouching for Williams' credibility was prejudicial.

### b. Referring to alleged evidence that was not a part of the record.

During closing argument, the prosecutor referred to matters that were not part of the record, such as the alleged activities of Holloway in court when he was not testifying, a hypothetical conversation in which unidentified persons spoke to Holloway after his testimony and praised him for not "snitching", argument that Holloway would have implicated petitioner in the shooting if he had testified truthfully, and some speculation that Rodriguez was suffering from "battered women's syndrome." None of this was based on any record evidence. The prosecutor's argument that Holloway would have implicated petitioner cannot be justified as an inference from any evidence in the record. Unlike Rodriguez, there was no evidence that Holloway ever made a statement to the police or anyone else implicating petitioner. Even if Rodriguez had actually seen petitioner among the gunmen, it would not show that Holloway would have also seen petitioner, too.

A prosecutor may not misstate or invent evidence during closing argument. *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (prosecutor invented character of dead victim and "testified" in victim's voice during closing argument). This is misconduct, which violates a defendant's due process rights if it renders a trial "fundamentally unfair." *Drayden v. White,* id, citing *Darden v. Wainwright*, 477 U.S. 168, 183, 91 L. Ed. 2d 144, 106 S. Ct. 2464 (1986), *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). In combination with the other errors, it did.

### c. Attempting to hold petitioner responsible for the general problems of society.

As set forth in the petition, the prosecutor finally offered an extreme argument in which he compared the African American petitioner to white supremacist lynch mobs in the South (i.e., the Ku Klux Klan), as well as Chinese mobsters in San Francisco's Chinatown, and mentioned

the plight of schoolchildren in Los Angeles being shot at by gang members. The argument was that lynch mobs, Chinese mobsters, and gang members escaped punishment because the community would not act, and by implication, that petitioner should not escape punishment as well through the jury's failure to act or witnesses' failure to come forward and testify.

> "A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear."

*United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994), quoting *United States v. Monaghan*, 741 F.2d 1434 (D.C. Cir. 1984) and citing *United States v. Solivan*, 937 F.2d 1146, 1150-55 (6th Cir. 1991). See also *United States v. Weatherspoon*, 410 F.3d at 1149, *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999), *Allen v. Woodford*, 395 F.3d 979, 1016 (9th Cir. 2005)

*United States v. Solivan* is the classic case of a prosecutor's urging the jury to punish a defendant for the general ills of society. The prosecutor urged the jury to "tell [defendant] and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . ." The court immediately cut the prosecutor's argument short and instructed the jury that its job was to determine defendant's guilt and not send messages to others. Despite the trial judge's quick actions, the appellate court reversed defendant's conviction, stating:

> "...government prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or generally, within their communities, or to send messages to all drug dealers. Such appeals are extremely prejudicial and harmful to the constitutional right to a fair trial.

*United States v. Solivan*, 937 F.2d at 1154. The court found the prosecutor's actions prejudicial and the trial court's admonition insufficient, holding that this sort of misconduct "called for stern rebuke and repressive measures." *United States v. Solivan*, 937 F.2d at 1157, quoting *Berger v. United States*, 295 U.S. 78, 85, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

*United States v. Weatherspoon, supra*, is similar. Besides improperly vouching for the

credibility of a witness, the prosecutor argued:

> "...Convicting Mr. Weatherspoon is gonna make you comfortable knowing there's not no convicted felons on the street with loaded handguns, that there's not no convicted felons carrying around semiautomatic. . . ."

Defense counsel objected, and the judge instructed the prosecutor to confine his arguments to "guilt or not guilt." The prosecutor, however, continued to argue:

> "...you can feel comfortable knowing there's a convicted felon that's been found guilty of possessing a loaded firearm, a fully loaded semiautomatic weapon....finding this man guilty is gonna protect other individuals in this community."

*United States v. Weatherspoon*, 410 F.3d at 1148. The Ninth Circuit found this improper, holding that it was clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact." Id. at 1150.

Similarly, in *Commonwealth of Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 487 (9th Cir. 1993), the prosecutor argued on closing:

> "Now as I said, a lot of people are interested in your decision.... Everyone in Saipan is interested. That's why there are so many people in the courtroom. The people want to know if they are going to be forced to live with a murderer.

> Your job is to worry about Mr. Mendiola. And when I say worry, I mean worry. Because that gun is still out there.

> Mr. Mendiola deserves to be punished for what he did and that's your decision. And it's important because, as I said, that gun is still out there. If you say not guilty, he walks out right out the door, right behind you."

The Ninth Circuit, noting that "when a case is not strong, prejudice is highly probable" found the prosecutor's appeal to the personal fears of the jury reversible error.

In this case, the effect of the prosecutor's comments was to suggest to the jury that the problems of shootings facing Oakland, like the lynch mobs in the South, Chinese mobsters in San Francisco, or gangs in Los Angeles, would continue if the jury did not convict petitioner. "It is error for a prosecutor to direct the jurors' desires to end a social problem toward convicting a particular defendant." *United States v. Solivan*, 937 F.2d at 1153. Combined with the prosecutor's other misconduct, this violated petitioner's right to a fair trial and to due process.

**4. Trial counsel was ineffective in failing to object
to the errors described in this petition or seek
appropriate relief for such errors.**

"Every criminal defendant has a constitutional right to competent legal representation. *People v. Pope* (1979) 23 Cal. 3d 412,; United States Constitution, Sixth and Fourteenth Amendments. To establish a claim of ineffective assistance of counsel, the accused must show that the trial attorney's representation was deficient, in that it fell below an objective standard of reasonableness, and that the accused was prejudiced by the trial attorney's deficient performance. *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 104 S. Ct. 2052, 2064-2065, 80 L. Ed. 2d 674; *People v. Ledesma* (1987) 43 Cal. 3d 171, 216-217. To establish prejudice, the accused must show that but for the trial attorney's assertedly deficient representation it was reasonably probable that the outcome of the proceeding would have been more favorable to the accused. *Strickland v. Washington, supra,* 466 U.S. at pp. 688, 693-694 *People v. Ledesma, supra*, 43 Cal. 3d at pp. 215-218."

*People v. Donaldson,* 93 Cal. App. 4th at 931-932. The *Donaldson* court had no difficulty concluding that trial counsel's failure to object to errors similar to some of those that occurred here (prosecutor testifying and vouching witness) was ineffective assistance under *Strickland*.

"Errors and omissions of defendant's trial attorney denied her the right to trial court adjudication of whether the prosecutor should take the stand as a witness, whether certain questions she answered were objectionable, whether she should withdraw from the case afterward, whether certain argument she made was objectionable, and whether the jury should receive ameliorative admonition. Had he raised those issues, the trial court could have exercised its plenary authority to conform the conduct of the trial to the requirements of due process. The errors and omissions of defendant's trial attorney created a reasonable probability of a less favorable outcome than if he had represented her competently."

*People v. Donaldson, id.* at 932

Counsel cannot excuse a failure to investigate as a "tactical" decision, *Evans v. Lewis,* 855 F.2d 631, 636-637 (9th Cir. 1988), *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir.1994), *Hart v. Gomez*, 174 F.3d 1067, 1070-1071 (9th Cir. 1999). Defense counsel's failure to keep abreast of the law and be aware of a major United States Supreme Court decision like *Crawford v. Washington* was ineffective.

**5. Petitioner would be entitled to an evidentiary hearing
on the issue of ineffective assistance of counsel if
respondent raises a material dispute on the issue.**

Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires the district court, if it grants an order to show cause, to independently review the record to determine whether or not an evidentiary hearing is "warranted." The Commentary to Rule

8(a) indicates that "warranted" includes determining whether an evidentiary hearing is mandatory and also whether it is "desirable" if not mandatory. Commentary, quoting *Townsend v Sain*, 372 US 293, 318, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963). Determining whether a non-mandatory hearing is "desirable" calls for an exercise of the court's discretion, but under Rule 8(a), the court must consider the "desirability" of an evidentiary hearing.

An evidentiary hearing is required if there is a material dispute of fact, which, if resolved in petitioner's favor, could justify granting petitioner relief.

Petitioner contends that defense counsel's conduct fell below an objective standard of reasonableness. Petitioner does not know yet whether respondent will dispute this. Petitioner's position is that any attempt by respondent to propose "legitimate tactical reasons" for defense counsel's acts and omissions that are not based on evidence showing that defense counsel actually relied on such reasons would be insufficient to raise a material evidentiary dispute concerning this issue. In other words, to raise a material dispute of "fact", respondent would have to present evidence, presumably in the form of a statement by defense counsel showing what his "tactical reasons" in fact were. If respondent presents no "facts", petitioner contends that this court would have to conclude that defense counsel had no legitimate tactical reasons for his acts and omissions.

Should respondent present evidence that defense counsel actually relied on certain tactical reasons, and not just argument that defense counsel could have relied on such reasons, or should the court conclude that argument that defense counsel could have relied on such reasons is sufficient to raise a material evidentiary dispute concerning the issue, petitioner would be entitled to an evidentiary hearing on the issue of the ineffectiveness of trial counsel, because he did not have a reasonable opportunity to obtain an evidentiary hearing in the state court proceedings.

In determining whether a petitioner is entitled to an evidentiary hearing under AEDPA, the district court:

> "must determine whether a factual basis exists in the record to support the petitioner's claim. If it does not, and an evidentiary hearing might be appropriate, the court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has 'failed to develop the factual basis of a claim in State court.' . . . . If the applicant has not 'failed to develop' the facts in state

ORIGINAL                                                          ORIGINAL

court, the district court may proceed to consider whether a hearing is appropriate or required under *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963)[overruled on other grounds in *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 5, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992)]."

*Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005), quoting *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) and *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999).

Under AEDPA, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Insyxiengmay v. Morgan*, 403 F.3d at 670, quoting *Williams v. Taylor*, 529 U.S. 420, 432, 146 L. Ed. 2d 435, 120 S. Ct. 1479 (2000). In *Insyxiengmay*, the defendant claimed an informer was a material witness and challenged the trial court's decision to exclude him and defense counsel from an in-camera hearing on the materiality of the informer's testimony as a violation of his rights to due process and the effective assistance of counsel under the Fifth and Sixth Amendments. The Ninth Circuit held that "fault cannot be attributed to *Insyxiengmay*" in failing to develop the factual basis of his claim that the informer was a material witness "because both he and his counsel were barred from the *in camera* hearing." *Id.* Fault also could not be attributed to Insyxiengmay's counsel, because the court excluded counsel from the *in camera* hearing and refused to allow him to submit questions for the court to ask the informant. *Insyxiengmay v. Morgan*, 403 F.3d at 671. See *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) ("It is clear that *Jones* did not 'fail to develop' the factual basis of either of his claims; rather, the state courts denied him the opportunity to develop the facts by failing to hold an evidentiary hearing.")

A petitioner is entitled to an evidentiary hearing in federal court if the state court's decision was an unreasonable determination of the facts. *Earp v. Ornoski*, 431 F.3d at 1166-1167, citing *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).

"*Townsend* establishes that a defendant is entitled to an evidentiary hearing if he can show that:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed

ORIGINAL                                                          ORIGINAL

> by the state court was not adequate to afford a full and fair hearing;
> (4) there is a substantial allegation of newly discovered evidence; (5)
> the material facts were not adequately developed at the state-court
> hearing; or (6) for any reason it appears that the state trier of fact
> did not afford the habeas applicant a full and fair hearing.

> *Townsend*, 372 U.S. at 313. If the defendant can establish any one of those
> circumstances, then the state court's decision was based on an unreasonable
> determination of the facts and the federal court can independently review the
> merits of that decision by conducting an evidentiary hearing. See *Taylor v.
> Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ('If, for example, a state court makes
> evidentiary findings without holding a hearing and giving petitioner an
> opportunity to present evidence, such findings clearly result in an "unreasonable
> determination" of the facts.')."

*Earp v. Ornoski*, 431 F.3d at 1167.

Where the factual basis for a claim is "adequately proffered" to the state court, a

petitioner is entitled to an evidentiary hearing in federal court:

> "Where the petitioner establishes a colorable claim for relief and has never been
> afforded a state or federal hearing on this claim, we must remand to the district
> court for an evidentiary hearing. *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v.
> Woodford*, 365 F.3d 706, 708 (9th Cir. 2004); *Phillips v. Woodford*, 267 F.3d 966,
> 973 (9th Cir. 2001). In other words, a hearing is required if: '(1) [the defendant]
> has alleged facts that, if proven, would entitle him to habeas relief, and (2) he did
> not receive a full and fair opportunity to develop those facts[.]' *Williams v.
> Woodford*, 384 F.3d 567, 586 (9th Cir. 2004)."

*Earp v. Ornoski, id.*

In *Earp v. Ornoski*, defendant claimed that the prosecutor committed misconduct by

intimidating a post-trial witness named Michael Taylor to prevent him from testifying in support

of a new trial motion. Defendant was charged with murder of a child. At trial, defendant testified

that he had been babysitting the child and working around the house when another individual,

Morgan, arrived. Defendant went outside to clean paintbrushes and left Morgan alone with the

child. About a half hour later, defendant went back inside, found the child motionless at the

bottom of a flight of stairs, and called emergency services. Morgan testified that he had never

been to the child's house. No witness other than defendant was able to place Morgan at the

house.

After defendant was convicted of murdering the child, defendant located a jail inmate,

Taylor, who had been in jail with Morgan and had overheard Morgan tell another inmate that

he had been at the house on the day the child died and that he was afraid defendant would

ORIGINAL                                                                    ORIGINAL

"come after him" because he had lied at trial. Taylor made an initial statement to this effect to the defense investigator, and then retracted it. He later declared that he had retracted the statement because the prosecutor and a sheriff's deputy had told him "would never get out" if he stood by his statement.

Defendant supported his claim in the state collateral relief petition with declarations from Taylor, the defense investigator, defendant's attorney, and a transcript of part of the prosecutor's interview with Taylor. Without conducting a hearing, the state court denied Earp's prosecutorial misconduct claim.

Under these circumstances, the Ninth Circuit held that Taylor had "adequately proffered" the factual basis of his claim to the state court, but never received an opportunity to develop his claim of prosecutorial misconduct in state court, because the state court had not held an evidentiary hearing.

> "Because we find that such a hearing was necessary to make the credibility determination upon which rejection of Earp's claim depends, we conclude that he has not had a 'full and fair' opportunity to develop the facts supporting his claim, see *Townsend*, 372 U.S. at 313, and, consequently, the state court decision summarily denying him habeas relief was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2); *Taylor [v. Maddox]*, 366 F.3d at 1001."

*Earp v. Ornoski*, 431 F.3d at 1169.

Petitioner here filed a companion collateral relief petition in the Court of Appeal, but the Court of Appeal did not hold any evidentiary hearing on trial counsel's alleged ineffectiveness. Under California collateral relief procedures, the California court does not reach the question of whether to hold an evidentiary hearing unless it first issues an order to show cause. *In re Lewallen* (1979) 23 Cal.3d 274, 278, *In re Lawler* (1979) 23 Cal.3d 190, 194. After the court has filed its order to show cause and all of the briefing has been filed, the court is required to hold an evidentiary hearing if a reasonable likelihood exists that the petitioner is entitled to relief and his claim depends on the resolution of a factual issue. There is no state rule of procedure that petitioner must request an evidentiary hearing in the petition. *In re Lawler* (1979) 23 Cal.3d 190, 194, California Rules of Court 4.551(f). Since the state court did not issue an order to show cause, petitioner never had an opportunity for an evidentiary hearing under state procedures.

As discussed above, where the factual basis for a claim is "adequately proffered" to the state court, but the state court does not hold an evidentiary hearing, a petitioner is entitled to an evidentiary hearing in federal court if he has alleged facts that, if proven, would entitle him to habeas relief, and he did not receive a full and fair opportunity to develop those facts in state court. See *Earp v. Ornoski* and discussion at page 22-27 of this brief.

Where petitioner has presented a colorable claim of ineffective assistance of counsel, issues such as whether counsel's acts and omissions represented "strategic decisions reached after 'thorough investigation of law and facts relevant to plausible options'" cannot ordinarily be determined without a factual hearing. *Earp v. Ornoski*, 431 F.3d at 1179, quoting *Strickland v. Washington*, 466 U.S. at 690.

As argued previously, petitioner did all he could do in state court to obtain an evidentiary hearing, but was unsuccessful. As such a hearing was necessary to determine whether trial counsel had any legitimate tactical reasons for doing what he did, the district court should have granted an evidentiary hearing on the above ineffectiveness issue.

### 6. Cumulative error

The court considers the prejudicial effect of all errors on appeal cumulatively, not in isolation. *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2002). The cumulative effect of the errors was prejudicial.

### 7. Conclusion

For the above reasons, petitioner requests that this court issue a writ of habeas corpus.

Dated: Oakland, California, Monday, November 26, 2007.


*Robert J. Beles*
_____

**Robert J. Beles**
Attorney for Defendant

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities