1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  JEFFREY M. LAURENCE
   Deputy Attorney General
6  State Bar No. 183595
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5897
8   Fax: (415) 703-1234
    Email: Jeff.Laurence@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

   **JARVIS GILBERT,**                              C 07-5987 TEH
13
                                     Petitioner,
14
15              **v.**

   **TOM FELKER, Warden,**
16
                                     Respondent.
17

18
              **POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

STANDARD OF REVIEW UNDER THE AEDPA .......................................... 10

INTRODUCTION ............................................................................................... 11

ARGUMENT ....................................................................................................... 12

I.   NO INEFFECTIVE ASSISTANCE OF COUNSEL FOR NOT
     MAKING EVIDENTIARY OBJECTIONS ............................................. 12

     A.   Applicable Legal Standard ............................................................. 12

     B.   The State Court Reasonably Found Trial Counsel Was Not
          Constitutionally Ineffective For Not Objecting To The Prosecution
          Calling A District Attorney And An Inspector From The District
          Attorney's Office As Percipient Witnesses .................................... 14

     C.   No Ineffective Assistance Of Counsel For Declining To Raise A
          Confrontation Clause Objection To Sergeant Cronin's Testimony About
          Fatima Robinson's Identification Of Petitioner ............................. 17

          1.   Factual Background .............................................................. 17

          2.   The State Court Reasonably Rejected Petitioner's Claim ... 18

     D.   Petitioner's Claim Of Ineffective Assistance For Not Objecting To
          Inspector Williams's Testimony Of A Statement By Fatima Robinson's
          Mother Is Unexhausted And Meritless ........................................... 21

          1.   Applicable Law Regarding Exhaustion ................................ 22

          2.   Proceedings Below Demonstrating The Claim Is Unexhausted ... 23

          3.   Petitioner's Claim Of Ineffective Assistance Of Counsel Is
               Meritless .............................................................................. 24

II.  THE STATE COURT REASONABLY REJECTED
     PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE
     FOR NOT OBJECTING TO ALLEGED PROSECUTORIAL
     MISCONDUCT ......................................................................................... 27

     A.   The State Court's Rejection Of Petitioner's Claim Of Ineffective
          Assistance For Not Objecting To Alleged Prosecutorial Vouching Is
          Not Unreasonable ........................................................................... 28

     B.   The State Court Reasonably Concluded Defense Counsel Was Not
          Ineffective For Not Objecting To References To Societal Problems In
          Closing Argument ........................................................................... 33

**TABLE OF CONTENTS  (continued)**

| | | Page |
|---|---|---|
| C. | The State Court Reasonably Rejected Petitioner's Claim Of Ineffective Assistance Regarding Assertions Of Facts Not In Evidence During Argument | 36 |
| D. | No Ineffective Assistance Regarding Alleged Burden-Shifting During Argument | 39 |
| E. | No Prejudice For Any And All Of Petitioner's Ineffective Assistance Of Counsel Claims | 42 |
| III. | NO PLAIN ERROR REVIEW UNDER CALIFORNIA LAW | 42 |
| IV. | PETITIONER HAS NOT MET HIS BURDEN OF ESTABLISHING THE NEED FOR AN EVIDENTIARY HEARING | 43 |
| CONCLUSION | | 45 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Woodford*
395 F.3d 979 (9th Cir. 2005)                                        35

*Anderson v. Calderon*
232 F.3d 1053 (9th Cir. 2000)                                       13

*Babbit v. Calderon*
151 F.3d 1170 (9th Cir. 1998)                                    13, 43

*Baldwin v. Reese*
541 U.S. 27 (2004)                                                  22

*Bell v. Cone*
535 U.S. 685 (2002)                                              10, 14

*Cassett v. Stewart*
406 F.3d 614 (9th Cir. 2005)                                     22, 43

*Castillo v. McFadden*
399 F.3d 993 (9th Cir. 2005)                                        22

*Crawford v. Washington*
541 U.S. 36 (2004)                                                  26

*Davis v. Washington*
547 U.S. 813 (2006)                                              26, 27

*Donnelly v. DeChristoforo*
416 U.S. 637 (1974)                                                 41

*Duncan v. Henry*
513 U.S. 364 (1995)                                                 22

*Early v. Packer*
537 U.S. 3 (2002) (per curiam)                                      11

*Edwards v. Lamarque*
475 F.3d 1121 (9th Cir. 2007) (en banc)                             14

*Garcia v. Bunnell*
33 F.3d 1193 (9th Cir. 1994)                                     28, 32

*Garvin v. Farmon*
258 F.3d 951 (9th Cir. 2001)                                     11, 44

*Gatlin v. Madding*
189 F.3d 882 (9th Cir. 1999)                                 22, 24, 38

**TABLE OF AUTHORITIES** (continued)

|  | Page |
|---|---|
| *Hasan v. Galaza*<br>254 F.3d 1150 (9th Cir. 2001) | 13 |
| *James v. Giles*<br>221 F.3d 1074 (9th Cir. 2000) | 22 |
| *Larche v. Simon*<br>53 F.3d 1068 (9th Cir. 1994) | 22 |
| *Lockyer v. Andrade*<br>538 U.S. 63 (2003) | 11 |
| *Marshall v. Lonberger*<br>459 U.S. 422 (1983) | 11, 44 |
| *O'Sullivan v. Boerckel*<br>526 U.S. 838 (1999) | 22 |
| *People v. Bransford*<br>8 Cal. 4th 885 (1994) | 24, 38 |
| *People v. Cookson*<br>54 Cal. 3d 1091 (1991) | 24, 38 |
| *People v. Donaldson*<br>93 Cal. App. 4th 916 (2001) | 16 |
| *People v. Ghent*<br>43 Cal. 3d 739 (1987) | 16 |
| *People v. McAlpin*<br>53 Cal. 3d 1289 (1991) | 16 |
| *People v. Medina*<br>51 Cal. 3d 870 (1990) | 16 |
| *Pizzuto v. Arave*<br>280 F.3d 949 (9th Cir. 2002) | 43 |
| *Price v. Vincent*<br>538 U.S. 634 (2003) | 11 |
| *Roe v. Flores-Ortega*<br>528 U.S. 470 (2000) | 13 |
| *Roman v. Estelle*<br>917 F.2d 1505 (9th Cir. 1990) | 22 |
| *Rompilla v. Beard*<br>545 U.S. 374 (2005) | 13 |

**TABLE OF AUTHORITIES** (continued)

Page

*Rose v. Lundy*
455 U.S. 509 (1982)                                                        22

*Rupe v. Wood*
93 F.3d 1434 (9th Cir. 1996)                                          16, 26

*Siripongs v. Calderon*
133 F.3d 732 (9th Cir. 1998)                                             13

*Smith v. Stewart*
140 F.3d 1263 (9th Cir. 1998)                                           13

*Sophanthavong v. Palmateer*
378 F.3d 859 (9th Cir. 2004)                                            14

*Strickland v. Washington*
466 U.S. 668 (1984)              12-14, 17, 19, 21, 28, 32, 33, 35, 36, 39, 42, 43

*Sumner v. Mata*
449 U.S. 539 (1981)                                                   11, 44

*Tennessee v. Street*
471 U.S. 409 (1985)                                                      26

*Torres v. Prunty*
223 F.3d 1103 (9th Cir. 2000)                                        11, 44

*Totten v. Merkle*
137 F.3d 1172 (9th Cir. 1998)                                           43

*United States v. Edwards*
154 F.3d 915 (9th Cir. 1998)                                         16, 32

*United States v. Johnston*
690 F.2d 638 (7th Cir. 1982)                                            16

*United States v. Koon*
34 F.3d 1416 (9th Cir. 1994)                                         34-36

*United States v. Leon-Reyes*
177 F.3d 816 (9th Cir. 1999)                                         34, 35

*United States v. Mitchell*
502 F.3d 931 (9th Cir. 2007)                                            26

*United States v. Necoechea*
986 F.2d 1273 (9th Cir. 1993)                                        28, 32

*United States v. North*
910 F.2d 843 (D.C. Cir. 1990) (per curiam)                             35

## TABLE OF AUTHORITIES  (continued)

Page

*United States v. Prantil*
764 F.2d 548 (9th Cir. 1985)                                      16

*Viereck v. United States*
318 U.S. 236 (1943)                                              34

*Williams v. Calderon*
52 F.3d 1465 (9th Cir. 1995)                                     13

*Williams v. Taylor*
529 U.S. 362 (2000)                                              10

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                               10, 11

*Yarborough v. Gentry*
540 U.S. 1 (2003) (per curiam)                               13, 14

**Constitutional Provisions**

United States Constitution
        Sixth Amendment                                   13, 20, 43

**Statutes**

United States Code, Title 28
        § 2254(b)                                               22
        § 2254(b)(2)                                22, 24, 27, 43
        § 2254(d)(1)                                        10, 14
        § 2254(d)(2)                                        11, 44
        § 2254(e)(1)                                        11, 44

Antiterrorism and Effective Death Penalty Act of 1996         10, 22

California Evidence Code
        § 800(a)                                               16

California Penal Code
        § 187                                                   1
        § 189                                                   1
        § 245(a)(2)                                             1
        § 246                                                   1
        § 664                                                   1
        § 12022.5(a)(1)                                         1
        § 12022.53(d)                                           1
        § 12022.7(a)                                            1
        § 12031(a)                                              1

**TABLE OF AUTHORITIES  (continued)**

**Page**

**Court Rules**

California Rules of Court
  Rule 8.500(c)(1)   24, 38
  Rule 8.500(d)    23
  Rule 8.504(b)(5)   23
  Rule 29(b)     24

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
GREGORY A. OTT
Deputy Attorney General
JEFFREY M. LAURENCE
Deputy Attorney General
State Bar No. 183595
   455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-3664
   Telephone: (415) 703-5897
  Fax: (415) 703-1234
  Email: Jeff.Laurence@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **JARVIS GILBERT,** | C 07-5987 TEH |
| Petitioner, | **POINTS AND AUTHORITIES IN SUPPORT OF ANSWER** |
| v. | |
| **TOM FELKER, Warden,** | |
| Respondent. | |

## STATEMENT OF THE CASE

On August 23, 2004, a jury found petitioner guilty of attempted premeditated murder (Cal. Penal Code §§ 664, 187, 189; count 6), eight counts of assault with a firearm (Cal. Penal Code § 245(a)(2); counts 1, 2, 3, 4, 7, 8, 9, 10), two counts of shooting at an occupied vehicle (Cal. Penal Code § 246; count 5, 11), and carrying a loaded firearm (Cal. Penal Code § 12031(a); count 12). The jury found as to the attempted murder count that petitioner personally discharged a firearm inflicting great bodily injury (Cal. Penal Code § 12022.53(d)), as to the assault counts that he personally used a firearm (Cal. Penal Code § 12022.5(a)(1)), and as to count 8 that petitioner personally inflicted great bodily injury upon Lester Williams (Cal. Penal Code § 12022.7(a)). (6RT 891-897; 3CT 528-

1   540, 684-695, 764-775.)  On October 8, 2004, the court sentenced petitioner to 42 years to life in

2   state prison.  (3CT 779-784, 786-790.)

3          On September 20, 2006, the California Court of Appeal affirmed petitioner's conviction

4   in an unpublished decision and denied his state habeas petition.  (Exhs. 8, 9.)  Petitioner filed a

5   petition for review from the affirmance of the direct appeal, which the California Supreme Court

6   denied on November 29, 2006.  (Exhs. 11, 12, 13.)

7          Petitioner filed the instant federal petition for writ of habeas corpus on November 27,

8   2007.  This Court issued an order to show cause on December 13, 2007.

9

10                              **STATEMENT OF FACTS**

11      **Overview Of The Shooting And Trial**

12          In the late night hours of October 11, 2002, and early morning hours of October 12, 2002,

13   petitioner twice shot at the car carrying Manuel Adrow, James Holloway, Lache Rodriguez, Fatima

14   Robinson, and Lester "Mookie" Williams, simply because Adrow had driven his car through

15   petitioner's gang's turf.  No one in the car was injured after the first shooting, but after the second

16   shooting, Lester Williams and Manuel Adrow went to the hospital with bullet wounds.

17          All of the victims were extremely reluctant to cooperate with the police or to testify at trial,

18   out of fear of retaliation.  The only solid information about the shooting came from Lache Rodriguez,

19   who was 14 years old at the time of the shooting and who initially gave two statements to the police.

20   In her first statement, she explained that the shooter was a man she knew from the street as "J-Rock."

21   During her second interview, she identified petitioner in a photo lineup as the shooter, "J-Rock."

22   At trial, she claimed a complete loss of memory and was impeached with her taped statement.  The

23   only other victim to appear at trial was James Holloway, who disclaimed any knowledge of the

24   incident.  However, he was impeached with his preliminary hearing testimony in which he recounted

25   the shooting incident, and identified petitioner as going by the moniker "J-Rock."  None of the other

26   victims would testify.  Petitioner's defense at trial was alibi.

27

28

1    **Prosecution's Case**

2    At around 4:00 a.m., the police were dispatched to the 900 block of 34th Street in West

3    Oakland on a report of a shooting and car crash. (2RT 286, 334.) At the scene, Officer Viglienzone

4    found a blue Ford Bronco that had hit a fence and plowed into three parked cars on the side of the

5    road. (2RT 289, 295.) The Ford was pock marked with numerous bullet holes. (2RT 290.) There

6    were several bullet holes in the driver's side door, the front windshield had a bullet hole, the driver's

7    window had been shot out, there was a bullet hole in the rear quarter panel, and the driver's side rear

8    tire was flat. (2RT 290-291, 332-333.) Officer Viglienzone located 13 shell casings from a .40

9    caliber pistol. The casings were recovered along a path leading from an Arco gas station parking lot

10   located at the corner of the block, to and around the crashed Ford, which was several houses down

11   from the corner gas station. (2RT 299-301, 303.) He also recovered two live rounds for a .38 special

12   revolver, and one live .40 caliber round. (2RT 301.)[1]

13   Officer Viglienzone also testified about gang turfs in West Oakland. He explained that

14   "2-6" refers to a gang that hangs out on 26th Street around Market Street and San Pablo Avenue in

15   West Oakland. A different gang controls the area called "Ghost Town," which is further up 27th

16   Street at around McArthur Boulevard and Martin Luther King Jr. Drive, and another gang controls

17   "3-7's," which is located at around 37th Street and Market. (2RT 317-319.) He also described a part

18   of town known as "the Acorns," named after a former housing complex in the area. (2RT 318.)

19   The police had been called to the scene of the shooting by the mother of Lache Rodriguez.

20   Lache had been in the Ford during the shooting and had run to her house, which was nearby, after

21   the incident. (5RT 642.) Lache, who was 14 at the time of the shooting, provided a written

22   statement to Sergeant David Cronin. (3RT 362; 5RT 620-621.) Sergeant Cronin visited Lache again

23   at her home on November 7, 2002, and taped his interview with her. (3RT 380; 5RT 624-625.)

24   Lache's taped statement was played to the jury at trial. (3RT 380; Exh. 3.)[2]

25   _____

26   1. Officer Viglienzone explained that a live round can get ejected when an automatic pistol
     jams and the shooter pulls back the slide to clear the jam. (2RT 302.)

27

28   2. Respondent's Exhibit 3 is the transcript of the taped statement that was included in the
     trial record as Trial Exhibit 8A.

Points and Authorities in Support of Answer - C 07-5987 TEH

3

1    Lache began the interview by repeatedly saying that she did not want to be taped because
2    she was worried that her statement would be played in court and she would be killed for talking to
3    the police. (Exh. 3 at 1.) However, she ultimately recounted the entire incident. She explained that
4    the "2-6" gang wanted to kill her boyfriend James Holloway and her cousin Manuel "M.C." Adrow.
5    (Exh. 3 at 2.) She explained that during the late hours of October 11th, she, her cousin Manuel
6    Adrow, her boyfriend James Holloway, and Fatima Robinson, were together in a Ford Bronco, with
7    Adrow driving. (Exh. 3 at 3, 18.) The incident began when Adrow drove down 26th Street in West
8    Oakland. As they drove down the street, a group of people hanging out on the street started yelling
9    at them to "come here." (Exh. 3 at 8.) Adrow ignored them and continued driving. (Exh. 3 at 8.)
10   However, when Adrow reached a part of Oakland called "the Acorns," another car pulled up along
11   side with a group of people from the 2-6. Lache saw "J-Rock" in the front passenger seat of the
12   other car. J-Rock was holding a gun and he and others started shooting at Adrow's car. (Exh. 3 at
13   8-9.) They fired around ten shots at Adrow's car, but none of the passengers were injured. (Exh. 3
14   at 9.) Adrow was able to get away by pushing another car out of the way and speeding away from
15   the area. (Exh. 3 at 4.)

16   Lache explained that the 2-6 gang had targeted Adrow and Holloway because the gang
17   wanted revenge for an earlier of killing of someone from the 2-6's turf. (Exh. 3 at 2, 9-10, 14-15.)
18   She noted that no one in her group was armed during the shootings. (Exh. 3 at 8.)

19   After the first shooting, Adrow drove around and made a couple of stops at friends'
20   houses. The group then decided that it would be safer to spend the rest of the night in Alameda,
21   rather than West Oakland. (Exh. 3 at 4-5.) To help ensure safe passage, they picked up Lache's
22   uncle, Lester "Mookie" Williams, who had friends in several gangs, including 2-6. (Exh. 3 at 5, 7.)

23   After picking up Mookie, the group drove to a nearby Shell gas station for some alcohol
24   and cigars. However, the gas station would not break a $100 bill, so they drove next door to the
25   Arco gas station. (Exh. 3 at 5.) They hung out at the gas stations for about an hour. When they
26   finally pulled out, another car pulled up right behind them and turned off its lights. The occupants
27   of that car started shooting at the group. (Exh. 3 at 5-6.) Adrow tried to drive away but crashed.
28   The rival group got out of their car and walked over toward Adrow's car, firing their guns as they

1  approached. (Exh. 3 at 5-6, 9, 12-13.) Lache once again saw J-Rock with the attackers firing his

2  gun, along with two others she knew as "J-Bay" and "Pistol." (Exh. 3 at 6-7, 11-13, 20.)

3        As soon as the shooting started, Adrow jumped out of the car and ran. Mookie then

4  stepped out of the car with his hands up, yelling "It's Mookie, it's Mookie," at which point J-Rock

5  and the other gunmen stopped shooting and left. (Exh. 3 at 6-7.) Lache then ran to her house, which

6  was nearby. (Exh. 3 at 9.)

7        Lache identified petitioner from a photo lineup as the shooter J-Rock. (Exh. 3 at 2.) She

8  signed the back of the lineup card after identifying petitioner's photo, number 3, as J-Rock. (Exh.

9  3 at 2-3.) However, she was very reluctant to sign it because of fear that petitioner's gang would find

10  her and kill her. (Exh. 3 at 11.) She ended the interview by reiterating her mortal fear of J-Rock and

11  her reluctance to be on tape. (Exh. 3 at 21.)

12        Lache was surreptitiously taped again on March 21, 2003, when she was arrested by

13  Sergeant Cronin for failing to appear at the preliminary hearing. (3RT 381; 5RT 628-631.) Sergeant

14  Cronin activated his recorder while booking Lache. (5RT 628-631.) During the booking procedure,

15  Lache reiterated several times that she did not want to testify at the preliminary hearing because she

16  was afraid of being killed by petitioner and his friends. (Exh. 4 at 5.)[3/] She told Sergeant Cronin that

17  if he was going to force her into court to testify against petitioner, he might as well shoot her right

18  then because she would be as good as dead. (Exh. 4 at 5.) She said that she was not going to give

19  any information in court, and made it clear that, although she had been truthful in her previous

20  statement to him, she would lie on the stand if asked about the incident. (Exh. 4 at 5-8, 10.) She was

21  audibly sobbing on the tape when talking about her fear of testifying. (Exh. 4 at 7.)

22        At trial, Lache claimed to have no memory of the shooting whatsoever. She asserted that

23  she was in a car crash that resulted in her being unconscious for several days, and she had no

24  memory as a result of the crash. (3RT 347.) She denied any knowledge of J-Rock or the shooting.

25  (3RT 347-349.) However, over the course of her testimony, her claim of lost memory was

26

27  ─────────────────────────────

28     3. Respondent's Exhibit 4 is the transcript of the taped statement that was included in the
trial record as Trial Exhibit 9A.

Points and Authorities in Support of Answer - C 07-5987 TEH

5

1  undermined by the fact that she recounted many of the details of the incident under vigorous

2  questioning by the prosecutor and on cross examination. (3RT 362-368.) Lache then claimed that

3  she, along with everyone else in the car, had taken the drug ecstacy before the shooting incidents.

4  (3RT 364-366.)

5       Lache also asserted that all of the information she gave to the police was actually told to

6  her by Fatima Robinson. (3RT 531.) She asserted that Fatima told her that "J-Rock" was the

7  shooter, but Lache had no idea who J-Rock was. (3RT 351-352.) She claimed to have no

8  recollection of ever identifying petitioner in a photo lineup, and she asserted she had never seen

9  petitioner before. (3RT 351-353, 373.) She claimed that Sergeant Cronin told her that the person

10 in photograph number 3 was "J-Rock" and directed her to identify him and sign the lineup page.

11 (3RT 392, 396.)

12      Lache asserted that she spoke to Fatima immediately after the shooting, just before running

13 home, at which time Fatima gave her all the information she relayed to Sergeant Cronin. (3RT 401.)

14 At the preliminary hearing, Lache claimed that Fatima told her that J-Rock was the shooter when

15 they spoke at the hospital where Manuel Adrow was admitted, sometime after the incident. (3RT

16 431-432.) However, she acknowledged at trial that she never visited Adrow at the hospital after the

17 incident. (3RT 430.)

18      District Attorney Inspector John Paul Williams testified that he served a subpoena on

19 Lache on July 19, 2004, for the trial. When he served her, she became very visibly upset, and was

20 so distraught that she defecated in her pants and began crying. (4RT 473-474.) She told the

21 inspector that, if she went to court, she would be killed. (4RT 474.) Lache failed to appear as

22 directed by the subpoena, and Inspector Williams arrested her on August 9, 2004. When arrested,

23 she again began crying and told him that petitioner's people would kill her for coming to court.

24 (4RT 478-479.)

25      Inspector Williams also described his fruitless efforts to locate Fatima Robinson and

26 Manuel Adrow. (4RT 480, 483.)

27      Jason Sjoberg, the deputy district attorney who handled the preliminary hearing, testified

28 about Lache's demeanor at that proceeding. (5RT 573, 576.) He explained that Lache was very

1   evasive and was visibly frightened. (5RT 576-579, 603, 614.) When asked to identify the shooter

2   in court, she claimed to be blind. She then pulled her sweatshirt up over her head and began crying,

3   before ultimately identifying petitioner. (5RT 579-580.)

4        Jason Sjoberg also described his efforts to have Fatima Robinson testify at the preliminary

5   hearing. Fatima met with Mr. Sjoberg at the courthouse on March 14, 2003. (5RT 584.) After the

6   meeting, Mr. Sjoberg accompanied Fatima to the courtroom to have the judge order her back for the

7   new hearing date. (5RT 586.) As they were approaching the courtroom, a woman approached

8   Fatima and whispered something to her. (5RT 588.) Fatima became visibly upset and scared, and

9   she ran out of the foyer. (5RT 589.) Mr. Sjoberg caught up with her and brought her to the

10  courtroom via a back elevator. Fatima was ordered to appear at the new hearing date, but after she

11  left the courtroom, she never came back and was not seen again. (5RT 590.)

12       James Holloway testified as a reluctant witness. He explained that he only agreed to come

13  to court because he had been arrested and was currently on felony probation for narcotic sales and

14  did not want to go to prison. (4RT 516.) He claimed not to know Lache and asserted that he did not

15  know Lache's name. (4RT 517.) He also asserted that he had no recollection of the events of

16  October 12th. (4RT 518.) He acknowledged that being a "snitch" could get him killed, and admitted

17  that he would never be a snitch and would not testify for the prosecution as a snitch under any

18  circumstances. (4RT 518-520.) Holloway was impeached with his preliminary hearing testimony,

19  which was read into the record. (4RT 528.)

20       At the preliminary hearing, Holloway gave a similar account of the actual shootings as

21  Lache, but with much of the detail omitted. He explained that he Adrow, Lache, and Fatima were

22  driving that night when a car pulled up along side and the occupants started shooting. (4RT 529-530,

23  534-535.) He did not see the shooters. (4RT 536-537, 552-553.) He denied that Adrow drove down

24  26th Street before the shooting. (4RT 533.)

25       Later that night, they picked up Mookie and went to the Shell gas station and then the Arco

26  gas station next door. (4RT 538-539.) As they left the Arco gas station, someone started shooting

27  at them. (4RT 539.) Holloway kept his head down the entire time. (4RT 539, 552-553.) Adrow

28  swerved as he fled the shots, lost control, and hit some parked cars and a fence. (4RT 541.) Adrow

1    then jumped out of the car and took off running. (4RT 541.) The assailants kept shooting until

2    Mookie leaned out of the car with his hands up and yelled, "It's Mook, it's Mook." The assailants

3    then stopped shooting and left. (4RT 541-544.) Everyone got out of the car and walked up the

4    street. At the corner, they found Adrow. He had been shot in the shoulder and had a graze wound

5    to his head. (4RT 546.) Holloway and Lache then walked to Lache's home together. Lache's

6    mother returned to the crash scene with them. (4RT 546.) Fatima was there "hollering and stuff"

7    and an ambulance was called. (4RT 546.)

8        Holloway testified that he recognized petitioner and knew him as someone who hung out

9    on the streets near Milton Street. He explained that petitioner was known on the street as J-Rock.

10    (4RT 531-532.) Holloway identified petitioner in court as J-Rock. (4RT 531.)

11        On cross examination, Holloway asserted that he did not see any of the shooters and

12    therefore did not see J-Rock at the shooting. Holloway added that he would not identify J-Rock as

13    a shooter in court even if he had seen J-Rock because Holloway would never be a snitch. (4RT 559-

14    561.)

15        Sergeant David Cronin testified about the circumstances under which he interviewed

16    Lache. He explained that when he took the first statement from Lache several hours after the

17    shooting, she mentioned that she knew the shooter as J-Rock. (5RT 623.) She gave a signed written

18    statement detailing the shooting and identifying the shooter as J-Rock. (5RT 623.) Based on his

19    own experience, Sergeant Cronin knew that petitioner hung out in that area and went by the moniker

20    J-Rock. (5RT 634.) Sergeant Cronin was not aware of any other person using the moniker J-Rock

21    in West Oakland. (5RT 634, 659.)

22        Based on his knowledge that petitioner used the moniker J-Rock, Sergeant Cronin prepared

23    a photo lineup with petitioner's photograph, which he showed to Lache on November 7, 2002, during

24    his second interview with her. Lache positively identified petitioner as J-Rock and as one of the

25    shooters for both assaults. (5RT 662, 627.) She then signed the lineup card indicating that

26    petitioner's photograph was the person she selected. (5RT 627.)

27        Sergeant Cronin acknowledged that he did not check the police department moniker

28    database to determine whether there were others who used the moniker J-Rock. (5RT 660, 685.)

Points and Authorities in Support of Answer - C 07-5987 TEH

1   He explained that, once the victims gave him the moniker J-Rock associated with the area of 26th

2   Street, he had a strong suspicion that petitioner was the J-Rock the witnesses saw. His suspicion was

3   confirmed when Lache identified petitioner out of the lineup, so there was no longer any reason to

4   consult the moniker database. (5RT 685-686, 691-692.) Sergeant Cronin explained that both Lache

5   and Fatima identified the shooter as J-Rock and that he also showed a lineup to Fatima. (5RT 685-

6   686.) When asked again why he did not consult the database, Sergeant Cronin elaborated that both

7   Lache and Fatima identified petitioner as the shooter and as J-Rock from the photo lineups so there

8   was no need to consult the database. (5RT 692.)

9       **Defense Case**

10      Petitioner's sister, Ursula Morris, testified as an alibi witness. (6RT 700.) She explained

11  that October 11th was the birthday of her and petitioner's niece, Destiny. (6RT 701.) She testified

12  that she drove petitioner, his kids, and Destiny's mother Tiffany Bonner to the Chuck E. Cheese

13  restaurant in Pleasanton at around 5 p.m. (6RT 701-702.) They stayed at the restaurant until around

14  8:30 p.m. and then Ursula drove them back to Oakland. (6RT 703.) Ursula dropped Tiffany off at

15  her house at around 10:30 p.m. on 35th Street in West Oakland. (6RT 704.) She then returned to

16  her own house in North Oakland with petitioner and his kids. (6RT 704.) Ursula claimed that the

17  mother of petitioner's kids, Niesha Kennedy, had not gone with them to Chuck E. Cheese. (6RT

18  723.) Petitioner called Niesha to get the kids. She arrived at around 11 p.m. and stayed over until

19  1:00 or 1:15 a.m. (6RT 704.) She then left with the kids, and petitioner spent the night with her.

20  (6RT 705.) She claimed that she asked petitioner to spend the night to help her because she was nine

21  months pregnant and needed the company. She asserted that she knew petitioner did not leave the

22  house that night because he slept in bed with her and she is a light sleeper. (6RT 707.) She also

23  claimed that all of her doors have deadbolts and cannot be opened from the inside without a key and

24  she keeps the only key in her night stand. (6RT 708-709, 721.)

25      On cross examination, Ursula acknowledged that petitioner goes by the moniker J-Rock.

26  (6RT 717.) She also admitted that, even though petitioner had been in custody for two years pending

27  trial she had never mentioned this alleged alibi to anyone, including the police, the prosecution, and

28  petitioner's defense attorneys, until the day before testifying at trial. (6RT 714, 732-734.)

1    Tiffany Bonner testified that she went with petitioner and Ursula to the Chuck E. Cheese

2    in Pleasanton for her daughter's birthday on October 11, 2002. (6RT 737.) They stayed at the

3    restaurant until 9:30 p.m., and Ursula and petitioner dropped her off at home on 35th Street in West

4    Oakland at around 10:00 or 10:15 p.m. (5RT 738-739.) She does not know where petitioner went

5    after that. (5RT 739.) Unlike Ursula, Tiffany Bonner testified that the mother of petitioner's

6    children, Niesha Kennedy, did accompany petitioner to the kids' party and was with petitioner in the

7    car when they dropped Tiffany off. (5RT 740-741.)

8    Finally, the defense called Jason Watts as a witness to demonstrate that petitioner was not

9    the only individual in West Oakland who used the moniker J-Rock. Jason Watts, a close friend of

10    petitioner's family, testified that he (Watts) lived in West Oakland and was called J-Rock. (6RT

11    745.) However, he was quick to point out that he had nothing to do with the incident and was not

12    involved in the shooting on October 12th. (6RT 743-748.) He also acknowledged that petitioner

13    has always been known as J-Rock. (6 RT 748, 751.)

14    ### STANDARD OF REVIEW UNDER THE AEDPA

15    This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

16    (AEDPA), which imposes "a new constraint on the power of a federal habeas court to grant a state

17    prisoner's application for a writ of habeas corpus." *Williams v. Taylor,* 529 U.S. 362, 412 (2000).

18    The purpose of the AEDPA is "to prevent federal habeas 'retrials' and to ensure that state-court

19    convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693

20    (2002). The statute's "highly deferential" standard for evaluating state court rulings "demands that

21    state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24

22    (2002) (per curiam).

23    Under the AEDPA, the federal court has no authority to grant habeas relief unless the state

24    court's ruling was "contrary to, or involved an unreasonable application of," clearly established

25    Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" law if

26    the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question

27    of law, or reaches a different conclusion based on facts materially indistinguishable from a Supreme

28    Court case. *Williams v. Taylor*, 529 U.S. at 413. A state court's decision constitutes an

1  "unreasonable application" of Supreme Court precedent if the state court identifies the correct

2  governing legal principles, but the application of law to the facts is not merely erroneous but

3  objectively unreasonable. *Id.* at 411-13; *accord Price v. Vincent*, 538 U.S. 634, 641-42 (2003);

4  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). The petitioner bears the burden of showing that the

5  state court's decision was unreasonable. *Woodford v. Visciotti*, 537 U.S. at 25. Habeas relief is

6  unwarranted where the state court's ruling was "at least reasonable." *Price v. Vincent*, 538 U.S. at

7  642-43; *Early v. Packer*, 537 U.S. 3, 10-11 (2002) (per curiam).

8       A state court's ruling based on a factual determination also must be "unreasonable" to

9  warrant habeas relief. 28 U.S.C. § 2254(d)(2); *Garvin v. Farmon*, 258 F.3d 951, 957 (9th Cir. 2001);

10  *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000). State court findings of historical fact are

11  presumed correct, unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see*

12  *Marshall v. Lonberger*, 459 U.S. 422, 431-36 (1983); *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)

13  (presumption of correctness applies to express and implied findings of fact by both trial and appellate

14  courts).

15                           **INTRODUCTION**

16       In his "Summary of Claims for Relief," petitioner identifies eight claims of ineffective

17  assistance of counsel. Pet. at 10-11.[4] Four claims are based on a failure to object to asserted

18  evidentiary errors, and four are for failing to object to asserted prosecutorial misconduct in closing

19  argument. Specifically, petitioner asserts counsel was ineffective by failing to object to the following

20  alleged errors by the prosecution:

21       a.   Calling an Alameda County District Attorney who had actively prosecuted
petitioner's criminal case to testify as a prosecution witness.

22

23       b.   Calling an investigator who worked for the Alameda County District Attorney's
office to testify about a witness' alleged reaction when served with a subpoena.

24       c.   Eliciting testimony from Sergeant Cronin that a witness never made available for
cross-examination, Fatima Robinson, had made an out of court identification of petitioner

25  as one of the gunmen, and arguing this out of court identification during closing.

26

27     4. Petitioner employs separate pagination for his petition and his memorandum of points and
authorities. For clarity, we follow petitioner's pagination and cite to the petition as "Pet." and

28  memorandum of points and authorities as "P&A."

1       d. Eliciting testimony from Inspector Williams that Rodriguez' [sic] mother, also a witness never made available for cross examination, had told him petitioner would have

2 his friends kill Rodriguez [sic] if she testified.

3       e. Prosecutorial closing argument that warranted the testimony at least one witness, an investigator from the district attorney's office.

4

5       f. Prosecutorial closing argument urging the jury to convict petitioner . . . "to protect community values, preserve civil order, or deter future lawbreaking." *United State v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994).

6

7       g. Prosecutorial closing argument arguing the existence of "facts" not a part of the record, or asking the jury to draw conclusions from matters that were not a part of the record, such as what a witness allegedly did after he finished testifying.

8

9       h. Prosecutorial closing argument stating that if the jury disbelieved petitioner's alibi witness, it would have to convict petitioner.

10  Pet. at 10-11.

11       Petitioner also asserts that "[t]he errors constituted 'plain error' under California law,

12 rendering them cognizable even in the absence of a showing of ineffectiveness." Pet. at 11.

13       We address petitioner's ineffective assistance claims relating to asserted evidentiary errors

14 in Argument I, and those ineffectiveness claims relating to alleged prosecutorial misconduct in

15 Argument II. Petitioner's plain error claim is addressed in Argument III, and his request for an

16 evidentiary hearing is addressed in Argument IV.

17                    **ARGUMENT**

18                       **I.**

19  **NO INEFFECTIVE ASSISTANCE OF COUNSEL FOR NOT MAKING EVIDENTIARY OBJECTIONS**

20

21       Petitioner's first four claims are directed at counsel's decision to withhold objection to

22 alleged evidentiary errors. The state court's rejection of these claims was not an unreasonable

23 application of Supreme Court precedent.

24  **A.  Applicable Legal Standard**

25       In order to establish counsel was ineffective, petitioner bears the burden of showing that

26 counsel's performance fell below an objective standard of reasonableness under prevailing

27 professional norms, and that there is a reasonable probability the result of the proceeding would have

28 been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 695-96 (1984). Petitioner must

1  plead and prove both prongs of this test. *Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001). In

2  considering the first prong of the test, the reviewing court "must indulge a strong presumption that

3  counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466

4  U.S. at 689. "Representation is an art, and an act or omission that is unprofessional in one case may

5  be sound or even brilliant in another." *Id.* at 693. The petitioner also "must overcome the

6  presumption that, under the circumstances, the challenged action 'might be considered sound trial

7  strategy.'" *Id.* at 689. Strategic decisions by counsel are "virtually unchallengeable." *Id.* at 690.

8  As to the second prong, a "reasonable probability" is "a probability sufficient to undermine

9  confidence in the outcome." *Id.* at 694. In order to prevail the petitioner must "affirmatively prove

10  prejudice." *Id.* at 693. The reviewing court need not assess counsel's performance where it is clear

11  that petitioner cannot show the requisite prejudice. *Id.* at 697; *Williams v. Calderon*, 52 F.3d 1465,

12  1470 n. 3 (9th Cir. 1995).

13       There is no one right way for an attorney to provide effective assistance. *Strickland* at 689.

14  The Supreme Court has "consistently declined to impose mechanical rules on counsel." *Roe v.*

15  *Flores-Ortega*, 528 U.S. 470, 481 (2000). Rather, the "Federal Constitution imposes one general

16  requirement: that counsel make objectively reasonable choices." *Id.* at 479; *Rompilla v. Beard*, 545

17  U.S. 374, 381 (2005) ("A standard of reasonableness applied as if one stood in counsel's shoes

18  spawns few hard-edged rules"). Thus, "the test is not whether another lawyer, with the benefit of

19  hindsight, would have acted differently, but whether 'counsel made errors so serious that counsel

20  was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Babbit*

21  *v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687, 689);

22  *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) ("The Sixth Amendment guarantees

23  reasonable competence, not perfect advocacy judged with the benefit of hindsight"); *Smith v.*

24  *Stewart*, 140 F.3d 1263, 1273 (9th Cir. 1998) (federal habeas court must "resile from" petitioner's

25  efforts to lure the Court "into the hindsight miasma that the Supreme Court has told [the courts] to

26  avoid"). "The relevant inquiry under *Strickland* is not what defense counsel could have pursued, but

27  rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133

28  F.3d 732, 736 (9th Cir. 1998); *see Anderson v. Calderon*, 232 F.3d 1053, 1096 (9th Cir. 2000)

1    (effectiveness must be judged on the basis of counsel's "actual performance in the courtroom, as

2    indicated by the trial transcript"). "*Strickland* does not mandate prescience, only objectively

3    reasonable advice under prevailing professional norms." *Sophanthavong v. Palmateer*, 378 F.3d

4    859, 870 (9th Cir. 2004).

5           Further, for petitioner to succeed, "he must do more than show that he would have satisfied

6    *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1),

7    it is not enough to convince a federal habeas court that, in its independent judgment, the state-court

8    decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Rather,

9    petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively

10   unreasonable manner. *Id.* Thus, federal habeas review of a claim of ineffective assistance is "doubly

11   deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam); *Edwards v. Lamarque*, 475

12   F.3d 1121, 1126 (9th Cir. 2007) (en banc) ("Because this case involves a claim of ineffective

13   assistance of counsel, there is an additional layer of deference to the choices of trial counsel.").

14   **B.**    **The State Court Reasonably Found Trial Counsel Was Not Constitutionally
        Ineffective For Not Objecting To The Prosecution Calling A District Attorney And
15        An Inspector From The District Attorney's Office As Percipient Witnesses**

16          In the first two claims identified in petitioner's "Summary of Claims for Relief," petitioner

17   contends that defense counsel was ineffective for not objecting to the "[c]alling [of] an Alameda

18   County District Attorney who had actively prosecuted petitioner's criminal case to testify as a

19   prosecution witness," or to the "[c]alling of an investigator who worked for the Alameda County

20   District Attorney's office to testify about a witness' alleged reaction when served with a subpoena."

21   Pet. at 10. Petitioner, however, does not offer any argument in support of his claim that defense

22   counsel was ineffective for failing to object to these two witnesses at trial, other than mentioning in

23   passing in a subsequent prosecutorial misconduct claim that the testimony appeared to be entirely

24   "irrelevant and gratuitous." P&A at 5. Petitioner's unsupported claim of ineffective assistance is

25   meritless.

26          The state court considered and rejected petitioner's claim. It explained that counsel's

27   performance could not have been deficient for not objecting because there was no legal basis for any

28   objection. The court ruled:

1    Defendant first contends that trial counsel's assistance was ineffective because counsel failed to object to the admission of testimony by Sjoberg and Williams, arguing
2    that counsel should have moved either to recuse the district attorney's office or to limit the testimony of these witnesses in an unspecified manner and for a jury instruction that the
3    testimony of these witnesses should not be given any greater credibility merely because they are employed by the district attorney's office. Defendant's argument is based on rule
4    5-210 of the Rules of Professional Conduct (hereafter Rule 5-210), which holds that it is improper for an attorney to act as both attorney and witness in the same trial without the
5    client's consent, and on Penal Code section 1424, which establishes standards for the recusal of a district attorney's office in the event of a conflict of interest.

6

7    Penal Code section 1424 does not require the recusal of a district attorney's office unless a conflict of interest exists that renders it unlikely that the defendant will receive
8    a fair trial. (*People v. Eubanks* (1996) 14 Cal.4th 580, 591.) Testimony by one or more employees of the district attorney's office ordinarily does not create such a conflict of
9    interest: "[R]ecusal of an entire district attorney's office, especially a large one . . . , has generally not been held required merely because one or more employees of that office are
10   witnesses in the case." (*People v. Snow* (2003) 30 Cal.4th 43, 86-87.) Defendant has not demonstrated any unusual circumstances that would justify departing from this general
11   rule for the Alameda County District Attorney's office. Because there was no basis for recusal of the district attorney's office, counsel's failure to seek recusal did not constitute
12   deficient performance. (E.g., *People v. Dickey* (2005) 35 Cal.4th 884, 915.)

13   Rule 5-210 is implicated when an attorney who is acting as an advocate in a case also acts as a witness. In a civil trial, this creates the potential for a conflict of interest,
14   requiring the consent of the client. In a criminal trial, there is the additional concern that the jury's weighing of the testimony of a prosecutor acting as both advocate and witness
15   may be influenced by the "'prestige and prominence'" of the office. (*People v. Donaldson* (2001) 93 Cal.App.4th 916, 928-929.) As *Donaldson* illustrates, the procedure also
16   creates other risks, such as the necessity for the prosecutor to comment on his or her own testimony in summation. Accordingly, a prosecutor should act as a witness in a case he
17   or she is prosecuting only under extraordinary circumstances and for compelling reasons and should then withdraw from any further participation. (*Id.* at p. 930.)

18   The same considerations do not apply when the testifying attorney is not one of the advocates at trial, and Rule 5-210 has never been held to apply to attorneys, such as
19   Sjoberg, who are not members of the trial team. Because there was no basis for objection to Sjoberg's testimony under Rule 5-210, counsel's failure to seek recusal or other relief
20   under this rule did not constitute deficient performance. (E.g., *People v. Dickey, supra,* 35 Cal.4th at p. 915.)

21

22   Defendant cites no authority for his additional contention that the testimony of the employees of the office should have been limited in some manner or subjected to a
23   cautionary instruction. We find no legal basis for these arguments.

24   Exh. 8 at 6-9.

25   The court also rejected petitioner's undeveloped claim that Sjoberg's testimony describing

26   his observations of the witness's demeanor was irrelevant and gratuitous. The court ruled: "We also

27   reject the argument, made in passing, that trial counsel should have objected to Sjoberg's testimony

28   regarding L.R.'s demeanor at the preliminary hearing because '[a] jury may consider a witness'

1  demeanor, but based on their own observations of it while the witness testifies.' As evidence of

2  L.R.'s concerns for her safety, Sjoberg's testimony was plainly relevant." Exh. 8 at 8.[5/]

3        Petitioner returns to this claim in his subsequent argument on vouching, suggesting that

4  it was somehow improper for the deputy district attorney who handled the preliminary hearing to

5  testify as a witness at trial. P&A at 6-8. Petitioner relies on *People v. Donaldson*, 93 Cal. App. 4th

6  916 (2001), and *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998). However, neither case

7  supports petitioner's claim. Both cases discuss the witness-advocate rule which generally prohibits

8  the current advocate, i.e., the prosecutor trying the case, from also testifying as a witness. Neither

9  case purports to extend that rule to prosecutors previously involved in the case. Indeed, the

10  appropriate method for resolving concerns under the witness-advocate rule is for the prosecutor to

11  remove himself from the role of advocate in the matter and assume the exclusive role of witness,

12  *People v. Donaldson*, 93 Cal. App. 4th at 916; *United States v. Prantil*, 764 F.2d 548, 553-54 (9th

13  Cir. 1985); *United States v. Johnston*, 690 F.2d 638, 643 (7th Cir. 1982), which is precisely what

14  occurred here. Thus, the state court properly rejected any claim of deficient performance for

15  declining to object to the testimony of Deputy District Attorney Sjoberg, acting exclusively as a

16  witness.

17        In sum, petitioner's claim of deficient performance is predicated on a failure to raise trial

18  objections that had no merit. The California Court of Appeal correctly ruled that such objections had

19  no merit, and thus petitioner failed to meet his burden of demonstrating counsel's performance was

20  constitutionally deficient. Defense counsel is not ineffective for failing to raise a futile objection.

21  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never

22

---

23  5. As a general matter, California law permits a witness to offer a lay opinion that is

24  rationally based on his or her own perception, including an opinion regarding a third party's appearance or demeanor. Cal. Evid Code § 800(a); *see People v. Medina*, 51 Cal. 3d 870, 887 (1990) (sheriff's deputy could testify defendant appeared "very responsive" and "very descriptive");

25  *People v. Ghent*, 43 Cal. 3d 739, 752 (1987) (officer testified that defendant did not seem

26  disoriented); *see generally People v. McAlpin*, 53 Cal. 3d 1289, 1306-08 (1991) (citing cases allowing lay opinions about extent of suffering, rationality, and intoxication based on personal

27  observation). Here, there is no dispute that Sjoberg observed Lache Rodriguez's demeanor while she testified at the preliminary hearing. Her demeanor was relevant for the jury in evaluating her

28  credibility when making the prior testimonial statements.

Points and Authorities in Support of Answer - C 07-5987 TEH

1  be deficient performance."). For this same reason, petitioner cannot show prejudice. The state

2  court's rejection of these claims was not an unreasonable application of *Strickland*.

3  **C.  No Ineffective Assistance Of Counsel For Declining To Raise A Confrontation Clause**
   **Objection To Sergeant Cronin's Testimony About Fatima Robinson's Identification**

4  **Of Petitioner**

5      Petitioner next contends that defense counsel was ineffective for failing to raise a

6  confrontation clause objection to Sergeant Cronin's testimony that Fatima Robinson identified

7  petitioner as one of the gunmen. P&A at 2 (claim c). The state court reasonably rejected this claim.

8  The state court explained that the record reflected defense counsel had a tactical reason for not

9  objecting to the challenged statements.

10  **1.  Factual Background**

11      The court of appeal explained the factual background leading up to the challenged

12  statement as follows:

13      Defendant contends that Cronin's testimony that Robinson had identified him in a
   photo lineup was admitted in violation of his Sixth Amendment right of confrontation

14  under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and that his attorney's
   failure to seek exclusion of that identification constituted ineffective assistance of counsel.

15

16      Robinson could not be located and did not testify at trial. During Cronin's direct
   testimony, he was not asked about and did not mention her identification of defendant. He
   did testify that he was familiar with defendant from his work in Oakland and that he knew

17  defendant as "J-Rock." During cross-examination, defense counsel asked whether
   "J-Rock" was a common street name. Cronin responded that he knew only one "J-Rock,"

18  defendant, and that he had never heard of Watts. Counsel then asked whether Cronin had
   checked the police department's database of street names to find out whether any other

19  "J-Rocks" were known to the department. Cronin acknowledged that he did not and that
   the database might have revealed other "J-Rocks." Defense counsel then suggested that

20  when Cronin first heard the name "J-Rock," he "assumed" it referred to defendant. Cronin
   responded that he did not assume that the shooter was defendant until after defendant had

21  been identified in a photo lineup, saying, "That's when I assumed it was [defendant] after
   he was identified by a witness and a victim." In response to questioning from the court,

22  Cronin acknowledged that it was his decision to include defendant's picture in that photo
   lineup. He explained that he included the picture because the name "J-Rock" had come

23  up and he knew defendant "to hang out" in the area where the first shooting occurred.

24      On initial redirect, Cronin testified without objection that Robinson had mentioned
   the name "J-Rock" and that he had shown the photo lineup to her, but he did not mention

25  the results of the lineup. On recross, defense counsel again pressed Cronin on his failure
   to consult the department's database of street names. He responded, "There was a specific

26  reason for not doing that. . . . The witness already identified [defendant] in a photo
   lineup."

27

28      On a second redirect, the prosecutor took up this line of inquiry:

1       "Q. [Defense counsel] keeps asking you about the database, and you answered that the witness already identified the defendant in a photo lineup.

2

3       "A. That's right.

4       "Q. Which witness?

5       "A. Fatima Robinson had identified him in the photo lineup.

6       "Q. Who else?

7       "A. [L.R.]"

8       Defense counsel neither objected to admission of this testimony nor sought a limiting instruction. Instead, on subsequent recross, counsel asserted that Cronin had told Robinson that the shooter was defendant. Cronin denied this. Counsel then asserted that

9 L.R. had told Cronin that she identified J-Rock as the shooter only because Robinson had told her that it was J-Rock. This was also denied.

10

11 Exh. 8 at 8-9.

12 **2.    The State Court Reasonably Rejected Petitioner's Claim**

13       The court of appeal considered and rejected petitioner's claim that defense counsel was

14 constitutionally ineffective for failing to object to Sergeant Cronin's testimony that Fatima Robinson

15 identified petitioner as one of the gunmen. The state court found that the record reflected defense

16 counsel's decision not to object was tactical. The court first observed:

17       *Crawford* holds generally that a defendant's Sixth Amendment right to confront witnesses is violated when the court admits an out-of-court "testimonial" statement by a

18 witness who is not available for cross-examination. (*Crawford, supra,* 541 U.S. at pp. 68-69.) Although the court did not provide a comprehensive definition of testimonial

19 statements, it stated that, "at a minimum," the term includes statements made during police interrogations. (*Id.* at p. 68.) Had Robinson's identification been offered to prove the

20 truth of the matter asserted—that defendant was the shooter—it would have been excludable under *Crawford*, since Robinson was not available for examination about her

21 identification.

22 Exh. 8 at 9-10.

23       The state court found that defense counsel withheld objection for tactical reasons. The

24 state court explained:

25       As noted above, when responding to a claim of ineffective assistance of counsel, we must defer to the tactical decisions of defense counsel. Where, as here, the record on

26 appeal fails to disclose why counsel acted or failed to act in the manner challenged, we must affirm the judgment unless counsel was asked for an explanation and failed to

27 provide one or unless there could be no satisfactory explanation for the conduct. (*People v. Gray, supra,* 37 Cal.4th at p. 207.) Because there is no evidence that trial counsel was

28 asked for an explanation of his decision, we must affirm unless there could be no

1   satisfactory explanation for his failure to move to limit or exclude the Robinson
2   identification.

3   We agree with the Attorney General that defense counsel's strategy at trial provides
    a satisfactory explanation. The jury could have concluded from L.R.'s testimony alone
    that Robinson had identified J-Rock as the shooter, since L.R. claimed to have learned the
4   identification from Robinson. Even without Cronin's testimony, therefore, defense
    counsel could have concluded that he needed to explain to the jury not only L.R.'s
5   identification of defendant in the photo lineup but also Robinson's naming of J-Rock.
    Counsel chose to explain these identifications by suggesting, through cross-examination
6   of Cronin, that it was Cronin who had injected defendant's name into the investigation,
    without regard to other persons known as "J-Rock"—for example, Jason Watts, who also
7   went by that nickname. In highlighting Cronin's failure to consult the street names
    database, counsel was attempting to persuade the jury that Cronin had focused exclusively
8   on defendant from the first. Defense counsel followed this by suggesting that it was
    Cronin who first mentioned defendant's name to both L.R. and Holloway.

9

10  When Cronin testified that Robinson had identified a picture of defendant in the
    photo lineup, defense counsel could have objected or sought a limiting instruction, at the
11  risk of calling further attention to the testimony. Instead, counsel sought to incorporate
    Cronin's testimony into the theme of his examination, asserting on further recross that
12  Cronin had suggested defendant's name to Robinson as well and that L.R. had told Cronin
    that she identified J-Rock only because Robinson had told her J-Rock was the shooter.
13  Counsel highlighted this theme in closing argument, arguing that Robinson would not
    have known defendant's nickname because she did not live in the area and that she must
    have learned the name from Cronin.

14

15  Given the challenge defense counsel faced in attempting to explain both Robinson's
    and L.R.'s naming of J-Rock, we find his approach to be the type of "reasonable, if
16  difficult, tactical decision[]" that we are not permitted to second-guess "in the harsh light
    of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) "Tactical errors are
17  generally not deemed reversible, and counsel's decisionmaking must be evaluated in the
    context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)
    Accordingly, we find no merit in defendant's claim of ineffective assistance of counsel.

18

19  Exh. 8 at 10-12.

20  The state court's finding that defense counsel had a tactical reason for withholding

21  objection is not an unreasonable application of *Strickland*. Indeed, the overarching defense strategy

22  in this case was to argue that Sergeant Cronin was the source of all of the identifications of petitioner

23  as J-Rock. Consequently, from a trial tactics standpoint, it did not matter whether the sergeant also

24  made the unproven assertion at trial that Fatima identified petitioner to him, because that

25  identification claim was equally subject to the defense attack that Sergeant Cronin directed both

26  witnesses to identify petitioner. Indeed, the defense vigorously pursued this strategy in closing by

27  arguing that because Fatima lived in East Oakland, she could not have been familiar with the fact

28  that petitioner used the moniker J-Rock, let alone with petitioner's identity as J-Rock, so she must

1  have learned that information from Sergeant Cronin, and not the other way around. (6RT 791-793,

2  810-811.)

3          The defense also relied on the strategy of asserting that all Lache's information linking

4  petitioner to the shooting came from Fatima, but that Fatima was not trustworthy based on the fact

5  that she lied to the police and failed to show up as a witness at trial. (6RT 806, 811-814.) For these

6  strategies to succeed, it was necessary to tie all of the identifications to Sergeant Cronin and Fatima

7  Robinson rather than Lache Rodriguez. Consequently, defense counsel had a legitimate tactical

8  reason for not objecting.

9          The fact that defense counsel made a tactical decision not to object is further demonstrated

10  by closing argument which reflected that counsel was well aware that Fatima's statements were

11  hearsay and had not been subject to confrontation. Defense counsel expressly argued to the jury:

12          Ladies and gentlemen, Fatima Robinson, you should discount anything you hear
        about her as all hearsay. She has not been here for any proceedings. You hear some self-
13          serving statements, or something and she left, but you don't know why she left. You don't
        know why she left. We don't know if she's still out there in those streets. I don't know
14          what happened to her. She didn't want to testify.
            One of the things you should know, though, and I tried to get out for you, is the fact
15          that when she first talked to the police, she gave him all erroneous information about
        where she lived, her age, whatever. . . . Remember when I first started opening argument
16          and I said, "You know what we have here? We have a case where we have victims that
        don't want to be saved," and this is what you have here for a number of reasons. And I'm
17          not saying that this is the way it should be, but what I'm telling you is conceptually this
        is what's going on.

18

19  (6RT 813-14.)

20          Defense counsel reiterated this point later in argument that it would be unfair for jurors

21  to consider any statements attributed to Fatima against petitioner because he "has had no prior

22  opportunity to confront and cross-examine her, which is a constitutional right under the Sixth

23  Amendment." (6 RT 819.) Consequently, as explained by the state court, defense counsel was well

24  aware of applicable confrontation clause and hearsay principles that he could have invoked to

25  exclude the statement, but made a tactical decision to allow the statements in order to use them to

26  his advantage in trying to convince the jury that Detective Cronin was the true source of the

27  identifications and that Lache's identification of petitioner was therefore tainted. Defense counsel

28  concluded that he could minimize the damaging aspects of the statement through argument to the

1  jury rather than by objection. The state court's conclusion that defense counsel decision was tactical

2  and did not amount to constitutionally deficient performance was not an unreasonable application

3  of *Strickland*. *See Strickland v. Washington*, 466 U.S. at 690 (explaining that strategic decisions by

4  counsel are "virtually unchallengeable").

5  Petitioner's claim also fails because he cannot demonstrate prejudice. The jury heard

6  ample evidence that Lache identified petitioner as the shooter. It had the lineup card with her

7  signature identifying petitioner as the shooter. The defense's only response to this devastating

8  evidence of guilt was to assert that Sergeant Cronin directed Lache to identify petitioner as the

9  shooter and to claim that Sergeant Cronin was lying on the stand when he denied this assertion.

10  Thus key issue was whether or not the jury would believe Sergeant Cronin's account or Lache's

11  claim at trial that he directed her to pick petitioner. The fact that Sergeant Cronin also noted that

12  Fatima selected petitioner added nothing to this fundamental choice. If Sergeant Cronin was telling

13  the truth, then Lache's identification was more than sufficient by itself to assure petitioner's guilt.

14  By contrast, if the jury believed the defense claim that Sergeant Cronin told the witnesses to identify

15  petitioner, then his uncorroborated statement that Fatima identified petitioner as the shooter was

16  equally suspect and would not have added any additional support. Under this state of the evidence,

17  even if the court had excluded Sergeant Cronin's statement that Fatima also identified petitioner,

18  there is no reasonable likelihood of a more favorable outcome. Petitioner's claim is unavailing.

19  **D.   Petitioner's Claim Of Ineffective Assistance For Not Objecting To Inspector**
20  **Williams's Testimony Of A Statement By Fatima Robinson's Mother Is Unexhausted**
   **And Meritless**

21  Petitioner next contends that defense counsel was ineffective for failing to raise a

22  confrontation objection to Inspector Williams's testimony about a statement made by the mother of

23  Fatima Robinson. P&A at 3-5 (claim d).[6] This claim has not been exhausted because it was not

24  fairly presented to the California Supreme Court. Consequently, the claim cannot provide a basis

25

26  _____

27  6.   Petitioner mistakenly refers to the statement as coming from the mother of Lache
Rodriguez in his petition. A careful reading of the record shows that Inspector Williams was
describing his conversation with Fatima Robinson's mother about Fatima's whereabouts, not Lache's

28  mother. (4RT 511-513.)

1    for granting the writ. It also fails on the merits.

2    **1.    Applicable Law Regarding Exhaustion**

3    For reasons of comity, a state prisoner must first exhaust his constitutional claims in state

4    court before seeking habeas relief in the federal courts. 28 U.S.C. § 2254(b); *Rose v. Lundy*, 455

5    U.S. 509, 518-19 (1982). In order to exhaust a claim, the defendant must "fairly present" the specific

6    factual and legal bases for each claim to the state's highest court. *Duncan v. Henry*, 513 U.S. 364,

7    365 (1995). This requires state prisoners to "give the state courts one full opportunity to resolve any

8    constitutional issues by invoking one complete round of the State's established appellate review

9    process," including discretionary review to the state supreme court if that is the state's practice.

10   *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, presenting a claim only to the California

11   Court of Appeal is insufficient to exhaust; it must be presented to the California Supreme Court.

12   *James v. Giles,* 221 F.3d 1074, 1077 n.3 (9th Cir. 2000); *Gatlin v. Madding,* 189 F.3d 882, 888 (9th

13   Cir. 1999); *Larche v. Simon,* 53 F.3d 1068, 1071-72 (9th Cir. 1994); *Roman v. Estelle,* 917 F.2d

14   1505, 1506 (9th Cir. 1990).

15   "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court

16   must read beyond a petition or a brief (or a similar document) that does not alert it to the presence

17   of a federal claim in order to find material, such as a lower court opinion in the case, that does so."

18   *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005)

19   ("To exhaust his claim, Castillo must have presented his federal, constitutional issue before the [state

20   court] within the four corners of his appellate briefing."); *see Gatlin v. Madding*, 189 F.3d 882, 888-

21   89 (9th Cir. 1999) (under state law, California Supreme Court does not consider other documents

22   in assessing petitions for review, thus federal court may not consider whether petition for review

23   exhausted claim by incorporating other documents).

24   Under the AEDPA, this Court may not grant a writ of habeas corpus for an unexhausted

25   petition. However, this Court can deny petitioner's claims on the merits notwithstanding petitioner's

26   failure to exhaust his state remedies. 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 624

27   (9th Cir. 2005).

28

1      **2.    Proceedings Below Demonstrating The Claim Is Unexhausted**

2             Petitioner filed a direct appeal raising several claims of ineffective assistance of counsel

3      in the California Court of Appeal in Case Number A108086. Exhs. 5-8. Petitioner then filed a

4      separate state habeas petition in the California Court of Appeal raising additional claims of

5      ineffective assistance of counsel in Case Number A113725. Exhs. 9-10. Petitioner's appeal was

6      denied in an unpublished opinion, Exh. 8, and his state habeas petition was denied by separate order,

7      Exhs. 9-10. Petitioner next filed a Petition for Review from the direct appeal affirmance in Case

8      Number A108086 to the California Supreme Court. Exhs. 11-13. Petitioner did not file a petition

9      for review from the state habeas denial in Case A113725. Exh. 10. Although petitioner purported

10     to include the issues raised in the state habeas petition in his petition for review by referring to the

11     denial of those issues in his review petition, such an attempt to include a separate case in a review

12     petition contravenes California's Rules of Court and is ineffective.

13            The California Rules of Court pertaining to petitions for review from a direct appeal and

14     a separate habeas petition are clear and mandatory. Rule 8.500(d) of the California Rules of Court

15     provides: "**Petitions in nonconsolidated proceedings.** [¶] If the Court of Appeal decides an

16     appeal and denies a related petition for writ of habeas corpus without issuing an order to show cause

17     and without formally consolidating the two proceedings, a party seeking review of both decisions

18     must file a separate petition for review in each proceeding." Rule 8.504(b)(5) of the California Rules

19     of Court provides that "[t]he title of the case and designation of the parties on the cover of the

20     petition must be identical to the title and designation in the Court of Appeal opinion or order that is

21     the subject of the petition."

22            In the state court proceedings, petitioner filed a single petition for review. The caption for

23     petitioner's petition for review reflected only the caption from the court of appeal opinion on direct

24     review. Exhs. 11-13. The California court docket for petitioner's cases reflect that review was

25     sought only from the California Court of Appeal's decision affirming the judgment, and not from

26     the denial of the habeas petition. Exhs. 10-13.

27            California law is also clear that the only issues the California Supreme Court will consider

28     in a petition for review are those issues that were actually presented to the Court of Appeal in the

Points and Authorities in Support of Answer - C 07-5987 TEH

23

1   briefing for the case for which review is sought. Rule 8.500(c)(1) of the California Rules of Court,

2   which sets out "Limits of review," provides: "As a policy matter, on petition for review the Supreme

3   Court normally will not consider an issue that the petitioner failed to timely raise in the Court of

4   Appeal." *See also People v. Cookson*, 54 Cal. 3d 1091, 1100 (1991) ("As a matter of policy, we

5   normally will not consider 'any issue that could have been but was not timely raised in the briefs

6   filed in the Court of Appeal.' (Cal. Rules of Court, rule 29(b).) In his briefs in the Court of Appeal,

7   defendant did not raise the issues of the constitutionality of the modification and the validity of the

8   order modifying probation to require higher restitution. We therefore do not address them now.");

9   *People v. Bransford*, 8 Cal. 4th 885, 893 n.10 (1994) (same). In *Gatlin v. Madding*, 189 F.3d at 887-

10  89, the Ninth Circuit held that the failure to comply with the California Rules of Court governing

11  review means that the affected issues were not fairly presented to the California Supreme Court and

12  are therefore unexhausted. *Gatlin* also made clear that a petitioner cannot exhaust issues in the

13  California Supreme Court by attempting to incorporate issues by reference to other proceedings. *Id.*

14       Petitioner's direct appeal did not include the issue he now raises regarding the failure to

15  object on confrontation grounds to the testimony of Inspector Williams relating a statement made

16  by Fatima's mother. Exh. 8. Accordingly, this claim is unexhausted and cannot serve as a basis for

17  granting the writ. We will, however, address the merits of petitioner's claims so that this court has

18  the opportunity to deny the petition on the merits pursuant to 28 U.S.C. § 2254(b)(2).

19       **3.    Petitioner's Claim Of Ineffective Assistance Of Counsel Is Meritless**

20       Petitioner asserts that defense counsel was ineffective for failing to raise a confrontation

21  clause objection to the introduction of a statement by Fatima Robinson's mother through Inspector

22  Williams. Petitioner's claim lacks merit. First, defense counsel did raise a hearsay objection that

23  was overruled by the court. Accordingly, defense counsel had no reason to conclude any further

24  objection on confrontation grounds would have been any more successful than his hearsay objection.

25  Second, the trial court's ruling was correct because the challenged statement was not offered for the

26  truth of the matter asserted, but rather to explain the officer's actions.

27       The challenged testimony came following an extensive discussion on direct and cross-

28  examination regarding Inspector Williams's futile efforts to locate and subpoena Fatima Robinson

1    for trial.  He described the numerous steps he took to track Fatima down, all of which were

2    unsuccessful. (4RT 480-81.) The investigator searched several databases and found an address for

3    Fatima's mother in Hayward.  At that address he spoke to Fatima's grandfather. (4RT 481.)  The

4    grandfather provided Inspector Williams with Fatima's mother's phone number, and the inspector

5    spoke with her over the phone. (4RT 482.) He explained that she was "[n]ot at all" helpful in

6    locating Fatima. (4RT 482.) As of the date of trial, he was still unable to find Fatima. (4RT 482.)

7           On cross-examination, the defense returned to the inspector's efforts to locate Fatima.

8    (4RT 506.) Defense counsel asked the inspector, "Isn't it true, officer, the reason why you couldn't

9    find [Fatima] Robinson was because all the information that she gave to the police was false?" (4RT

10   506.) The inspector rejected this assertion. Defense Counsel then asked the inspector, "Did you try

11   to get any information from anyone in terms of the location of [Fatima] Robinson?" (4RT 506.) The

12   inspector responded that he spoke to the grandfather and mother who related that Fatima would drop

13   by the house to take showers and change clothes, but was mostly living on the streets. (4RT 506.)

14   Defense counsel further questioned whether the inspector tried to utilize any information from the

15   police reports or investigations "to find Ms. Robinson"? (4RT 507.)

16          On redirect, the prosecution followed up on this point, asking the inspector what Fatima's

17   mother said to him with respect to helping him find Fatima.  At that point, defense counsel lodged

18   a hearsay objection, which the trial court overruled. (4RT 511.) Inspector Williams then testified:

19   "She told me that she wasn't going to help me locate her daughter, because if she did, the defendant

20   would have his friends kill her." (4RT 511.) He continued, "She was not helpful at all.  She

21   repeated on multiple occasions that she would not help me, because she would not put her daughter's

22   life in jeopardy." (4RT 511-12.) On recross, defense counsel clarified that Fatima's mother did not

23   give the officer any names as to person who would want to kill her, and did not mention the name

24   "J-Rock." (4RT 512-13.)

25          Petitioner now contends that defense counsel was constitutionally ineffective for not

26   supplementing his hearsay objection with a confrontation clause objection as well. Petitioner cannot

27   meet his burden of demonstrating deficient performance.  Given that the court had already denied

28   his hearsay objection, adding a confrontation clause objection would have been a futile act.

1    Counsel's decision to withhold a futile objection is not deficient performance. *Rupe v. Wood*, 93

2    F.3d at 1445. Indeed, to continue to object in the face of the court's overruling risked alienating the

3    jury.

4         Moreover, counsel's failure to object on confrontation grounds cannot be deemed

5    incompetent because such an objection had no merit. An examination of the exchange reflects that

6    the statement was not introduced for the truth of the matter asserted, that petitioner would have

7    Fatima killed, but to reflect the mother's state of mind in refusing to assist in locating Fatima and

8    to explain the inspector's actions in his unsuccessful attempts to locate Fatima. This purpose was

9    clear from the prosecutor's question immediately following the challenged statement attributed to

10    Fatima's mother, asking, "And so she was not helpful to you in locating Ms. Robinson?" (4RT 511.)

11         It is well settled that a statement not offered for the truth of the matter asserted does not

12    implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (observing

13    the Confrontation Clause "does not bar the use of testimonial statements for purposes other than

14    establishing the truth of the matter asserted."); *Tennessee v. Street*, 471 U.S. 409, 414 (1985); *United

15    States v. Mitchell*, 502 F.3d 931, 966 (9th Cir. 2007). Because the statement was not offered for the

16    truth, but merely to demonstrate Fatima's mother's state of mind in refusing to cooperate and the

17    inspector's inability to locate Fatima through her family, it does not implicate the Confrontation

18    Clause.

19         The statement also does not implicate the Confrontation Clause because it was not

20    testimonial. The Supreme Court identified the standard for testimonial statements in *Davis v.

21    Washington*, 547 U.S. 813, 822 (2006).

22    Statements are nontestimonial when made in the course of police interrogation under
      circumstances objectively indicating that the primary purpose of the interrogation is to

23    enable police assistance to meet an ongoing emergency. They are testimonial when the
      circumstances objectively indicate that there is no such ongoing emergency, and that the

24    primary purpose of the interrogation is to establish or prove past events potentially
      relevant to later criminal prosecution.

25

26    *Id.*

27         Here, Inspector Williams was asking Fatima's mother about Fatima's whereabouts in order

28    to serve her with a subpoena for trial. He was not interrogating her about the facts of the case nor

1  trying "to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

2  Rather, he was attempting to gain information about the current situation in locating Fatima, much

3  like the 911 call in *Davis*. The mother "was not acting as a witness; she was not testifying." *Id.* at

4  822-28. The questioning was designed to elicit information to resolve a current situation, which

5  although not a crisis, was part of the administrative function of the inspector's duties rather than the

6  interrogative function. *Id.* Accordingly, it more closely aligns with the statements found to be

7  nontestimonial in *Davis* than the statements found to be testimonial in *Hammon*. *Id.* Consequently,

8  counsel's performance cannot be deemed deficient for failing to make a meritless objection.

9       Petitioner also cannot demonstrate prejudice. First, for the reasons stated above, the

10  objection would have been overruled by the court, which had already overruled the hearsay

11  objection. Second, the objection would have been unavailing, since the Confrontation Clause was

12  not implicated. Third, even a successful objection resulting in exclusion of the mother's statement

13  was not reasonably likely to result in a more favorable outcome. The statement was speculative, not

14  tied to a report of any actual threats, and there was nothing to suggest that Fatima's mother had any

15  first hand information. The comment was isolated and introduced in passing, was not referred to in

16  closing argument, and played no part in the trial. Moreover, there was already substantial evidence

17  the witnesses' fear about testifying, to which the mother's statement added little. There is no

18  reasonable probability that petitioner would have received a more favorable outcome had defense

19  counsel made the objection. Consequently, notwithstanding that this claim is unexhausted, this

20  Court should deny it on the merits. 28 U.S.C. § 2254(b)(2).

21

**II.**

22

23  **THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE FOR NOT OBJECTING TO ALLEGED PROSECUTORIAL MISCONDUCT**

24

25       Petitioner next raises four claims of ineffective assistance of counsel for failing to object

26  to alleged prosecutorial misconduct committed during the prosecution's closing argument.

27  Petitioner's claims lack merit.

28       An attorney's election to withhold objection during closing argument is a prototypical

1 | tactical decision which ordinarily does not support a claim of ineffective assistance. *Garcia v.*

2 | *Bunnell*, 33 F.3d 1193, 1199 (9th Cir. 1994) ("many trial lawyers refrain from objecting during

3 | closing argument to all but the most egregious misstatements by opposing counsel on the theory that

4 | the jury may construe their objections to be a sign of desperation or hyper-technicality") (citation

5 | omitted); *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers

6 | refrain from objecting during opening statement and closing argument, absent egregious

7 | misstatements, the failure to object during closing argument and opening statement is within the

8 | 'wide range' of permissible professional legal conduct.").

9 |        Here, petitioner has not rebutted by clear and convincing evidence the state court's factual

10 | findings of tactical reasons for withholding objection, and petitioner has failed demonstrate the state

11 | court's rejection of petitioner's claims was an unreasonable application of *Strickland*.

12 | **A. The State Court's Rejection Of Petitioner's Claim Of Ineffective Assistance For**
**Not Objecting To Alleged Prosecutorial Vouching Is Not Unreasonable**

13 |

14 |        Petitioner contends that defense counsel was constitutionally ineffective for not objecting

15 | to alleged vouching by the prosecution during closing argument.  Petitioner begins by pointing out

16 | that two employees of the District Attorney's Office testified at trial, Deputy District Attorney

17 | Sjoberg and Inspector Williams.  Deputy District Attorney Sjoberg testified about Lache's fearful

18 | demeanor while testifying at the preliminary hearing and Fatima's terrified desertion from the

19 | courtroom before she had testified (5RT 573-79, 603, 614), and Inspector Williams described

20 | Lache's fearful demeanor when he served her with a subpoena for trial and a bench warrant for her

21 | arrest to compel her presence at trial (4RT 473-74, 478-79).

22 |        Petitioner contends that the prosecution committed misconduct by calling Sjoberg and

23 | Williams as witnesses, and then making statements vouching for them during closing.  Petitioner

24 | identifies three passages from closing argument that he contends constituted impermissible

25 | vouching.  First, he cites to the following passage by the prosecution during rebuttal argument

26 | countering the defense claim that Inspector Williams lied about seeing Lache soil herself when she

27 | was served with the subpoena for trial:

28 |       Defense counsel basically says Inspector Williams . . . [is] lying when he says Lache

1    Rodriguez defecated on herself when he went out to serve the subpoena. I admire that
     from [defense counsel], that he will say that straight out, and he's entitled to his opinion.
2    But ladies and gentlemen, let me ask you, why would an inspector with the District
     Attorney's office with ten years background in law enforcement and a good job here in the
3    District Attorney's office, get on the stand and commit perjury; put his entire profession
     on the line and everything that he's worked for on the line for that, for that lie? I mean,
4    if he's going to do it, if he's going to say that or if he's going to make up a lie, why not
     instead say when I picked up Lache Rodriguez she said, ["Y]eah, I saw J-Rock do it. I
5    was there. I saw everything, but you are never going to get me to talk to you, Cop. You
     can take me in, but I'm going to get up there and I'm going to tell the jury all this." Why
6    say she defecated on herself? Why not for that matter say she peed on herself or urinated?
     There's no reason, no motive at all for Inspector Williams to say anything about [sic: but]
7    the truth.

8    (6RT 838-839.)

9        Petitioner next contends the prosecution vouched for the testimony of both Sjoberg and

10   Williams in this passage from rebuttal argument:

11       Second, I want to talk about what I told you would happen and what did indeed
         happen when I first talked to you in opening statements about this case, and that is,
12       namely, the fact that defense and the witnesses would say anything, attack credibility of
         police officers, of the District Attorney's office, the District Attorney inspectors in an
13       attempt to get you to focus off the true facts of this case, and focus perhaps on some other
         reasons looking at the police or other aspects.
14

15   (6RT 824.)

16       Finally petitioner points to the following commentary by the prosecution regarding Inspector

17   Williams's report of Lache soiling herself as vouching for the officer's credibility:

18       And that whole incident, quite frankly, when he told me, I was thinking, you got to
         be kidding. You are kidding about that, making some sort of sick joke about the poor little
19       girl. No, that's what happened. You are willing to go on the stand under oath, if I need
         you to tell that? You don't make that stuff up, ladies and gentlemen. There's no reason
20       to make that up.

21   (6RT 839.)

22       Defense counsel did not object to any of these statements at trial. Petitioner asserts

23   defense counsel's decision not to object amounted to constitutionally deficient performance. The

24   state court reasonably rejected petitioner's claims. The court held:

25       Defendant also claims that counsel provided ineffective assistance by failing to object
         to several alleged instances of prosecutorial misconduct during closing argument.
26
         Because of "the unique function he or she performs in representing the interests, and
27       in exercising the sovereign power, of the state," a prosecutor is held to a standard higher
         than that imposed on other attorneys. (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)
28       Two separate standards govern prosecutorial misconduct, federal and state. The United

States Constitution is violated when a prosecutor's improper behavior comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Navarette* (2003) 30 Cal.4th 458, 506; *Hill*, at p. 819.) Conduct that does not violate the federal constitutional standard is nevertheless a violation of state law if it involves the use of "'deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 122; *Hill*, at p. 819.)

Prosecutorial misconduct is subject to a strict rule of waiver. An incident of alleged misconduct may not be raised on appeal unless a timely objection was made to the trial court, the basis for the objection was identified, and a request was made to admonish the jury to disregard the conduct. (*People v. Brown* (2003) 31 Cal.4th 518, 553.)[7] Further, a conviction will not be reversed as a result of prosecutorial misconduct unless "it is reasonably probable that a result more favorable to the defendant would have been reached" in the absence of the misconduct. (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

### a. Vouching for Witnesses

Defendant contends that defense counsel provided ineffective assistance by failing to object on three occasions when the prosecutor purportedly vouched for the truthfulness of the district attorney's office employees who testified about L.R.'s anxiety at the preliminary hearing and upon being served with a trial subpoena.

First, in closing argument, defense counsel argued that it was not credible that L.R. had defecated when served with the subpoena by Williams, accusing Williams of lying. Seeking to counter that argument in rebuttal, the prosecutor asked the rhetorical question, "[W]hy would an inspector with the District Attorney's office with ten years background in law enforcement and a good job here in the District Attorney's office, get on the stand and commit perjury; put his entire profession on the line and everything that he's worked for on the line for that, for that lie?" Second, the prosecutor stated that "defense [counsel] and the witnesses would say anything, attack credibility of police officers, of the District Attorney's office, the District Attorney inspectors in an attempt to get you to focus off of the true facts of this case . . . ." Finally, again addressing Williams's testimony that L.R. defecated upon receiving the subpoena, the prosecutor said, apparently quoting his remarks to Williams when learning of the incident, "And that whole incident, quite frankly, when [Williams] told me, I was thinking, you got to be kidding. You are kidding about that, making some sort of sick joke about the poor little girl. No, that's what happened. [']You are willing to go on the stand under oath, if I need you to tell that?['] You don't make that stuff up, ladies and gentlemen. There's no reason to make that up."

Impermissible vouching occurs when a prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony. (*People v. Williams* (1997) 16 Cal.4th 153, 257.) "[S]uch statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination.'" (*Hill*, *supra*, 17 Cal.4th at p. 828.) On the other hand, the rule

---

7. The requirement of an objection and request for admonishment is excused only if (1) objection would have been futile (*People v. Brown*, *supra*, 31 Cal.4th at p. 553); (2) admonishment would not have cured the harm caused by the misconduct (*People v. Sapp* (2003) 31 Cal.4th 240, 279); or (3) an objection was made and overruled. (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) Defendant makes no argument that any of these circumstances existed here.

against vouching does not preclude all argument about the reliability of testimony.  A "'prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom' [citation], and in his argument to the jury the prosecutor may comment upon the credibility of witnesses 'in the light of all the evidence in the case.'"  (*People v. Perez* (1962) 58 Cal.2d 229, 245, overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 32, 34.)

The first two examples cited by defendant constituted neither the expression of the prosecutor's personal opinion nor an improper reference to matters outside the record.  In asking the jury to consider the reasons why Williams would lie, the prosecutor was referring to facts within the record—the inspector's job and length of service—and urging the jury to draw an inference from those facts.  There is nothing improper in such argument.  (See, e.g., *People v. Anderson* (1990) 52 Cal.3d 453, 478-479 [prosecutor's reference to officers' experience in arguing their credibility not misconduct].)[8]  The second example, simply a restatement of the defense argument that the testifying officers were lying, similarly did not constitute impermissible vouching.  Because these were permissible comments, counsel's failure to object to them did not constitute deficient performance.  (E.g., *People v. Dickey*, *supra*, 35 Cal.4th at p. 915.)

The third example is ambiguous.  The prosecutor appeared to be restating for the jury, in condensed form, the events at a meeting with Williams and referring to his own subjective response to Williams's story.  The statement, "No, that's what happened," although ambiguous, could be taken as a personal affirmation of the truth of the incident based on facts outside the record.  Accordingly, there was at least an argument that the prosecutor's ambiguous statement constituted both types of impermissible vouching.

The very ambiguity of the prosecutor's remarks, however, provides a satisfactory explanation for defense counsel's failure to object.  It was not clear that the prosecutor was, in fact, engaging in impermissible vouching, and any such vouching was both ineffective and directed at a comparatively peripheral issue.  Defense counsel legitimately could have concluded that there was little tactical advantage in objecting to the argument.  (See *People v. Huggins* (2006) 38 Cal.4th 175, 206 [rejecting claim of ineffective assistance because "counsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to them"].)

Further, we find no reasonable probability that, but for the failure to object, the result of the proceeding would have been different.  (*People v. Davis*, *supra*, 36 Cal.4th at p. 551.)  The prosecutor's remarks were ambiguous.  Giving them their most improper implication, they constituted a statement that the prosecutor had personally concluded that Williams was telling the truth about L.R.'s defecation because Williams had told him about the event during a pretrial interview.  Any bolstering effect would have been limited, since the argument implied merely that Williams had been consistent in telling his story and that the prosecutor found this consistency convincing.  Further, whether or not L.R. defecated when she was served with the trial subpoena was not critical to the outcome at trial, given the substantial additional evidence of L.R.'s fear of retribution, including her own affirmations of fear.  Both because we find a satisfactory explanation for counsel's failure to object and because the remarks are not likely to have had an impact on the outcome, the claim of ineffective assistance of counsel fails.  (*People v. Turner* (2004) 34 Cal.4th 406, 432-433.)

---

8.  Defendant cites a series of cases from the Ninth Circuit that are arguably inconsistent with *People v. Anderson*.  As decisions from another jurisdiction, they do not control here.

1    Exh. 8 at 13-15 (footnotes in original).

2           The state court's conclusion was not an unreasonable application of *Strickland*. Petitioner

3    has not met his burden of demonstrating that defense counsel's withholding of objection was

4    anything other than a tactical decision not to object to "all but the most egregious misstatements."

5    *Garcia v. Bunnell*, 33 F.3d at 1199; *accord United States v. Necoechea*, 986 F.2d at 1281.  As the

6    state court observed, whether these comments crossed the line to impermissible vouching was

7    doubtful, and the comments certainly not so egregious as to compel objection to ensure competent

8    representation.  Indeed, counsel had little incentive to object given the wholly collateral nature of

9    the asserted vouching. The challenged statements centered on Inspector Williams's testimony about

10   whether Lache Rodriguez soiled herself when served with a subpoena, an issue that was hardly

11   critical to the outcome of the case.

12          For this same reason, the state court's conclusion that petitioner did not demonstrate

13   prejudice was not unreasonable.

14          Petitioner also suggests that the fact that the prosecution called Deputy District Attorney

15   Sjoberg, who conducted the preliminary hearing, to testify at trial somehow constituted vouching.

16   Petitioner cites to *United States v. Edwards*, 154 F.3d at 922, for support.  P&A at 6-8.  Petitioner's

17   claim is meritless.  *Edwards* involved a situation in which the very prosecutor who was trying was

18   also a key witness in the case.  Consequently, that prosecutor's closing argument about the evidence

19   for which he personally was a witness amounted to vouching because it necessarily placed his

20   authority as the advocate in the trial behind the evidence he discovered.  *Id.*  That case is inapposite

21   because Deputy DA Sjoberg did not act as an advocate in petitioner's trial and was not in a position

22   to vouch for his own veracity.  As noted previously, the attorney-advocate rule and the corollary

23   vouching concerns are implicated when the advocate in the case takes the stand and then comments

24   on his own testimony.  It does not apply when another member of the District Attorney's Office takes

25   the stand as a percipient witness.  The state court properly rejected petitioner's claims that the calling

26   of Sjoberg as a witness and the references to his testimony in closing was impermissible or

27   constituted vouching.

28          Petitioner's claim fails because the state court reasonably concluded that the challenged

1  argument did not constitute vouching, and that petitioner failed to meet his burden of demonstrating

2  prejudice. The state court's ruling was not an unreasonable application of *Strickland*.

3  **B.  The State Court Reasonably Concluded Defense Counsel Was Not Ineffective**
   **For Not Objecting To References To Societal Problems In Closing Argument**

5  Petitioner contends that defense counsel was constitutionally ineffective for not objecting

6  to the prosecutor's references to societal problems during argument. Petitioner claims that the

7  prosecutor "compared the African American petitioner to white supremacist lynch mobs in the South

8  (i.e. the Ku Klux Klan), as well as Chinese mobsters in San Francisco's Chinatown, and mentioned

9  the plight of schoolchildren in Los Angeles being shot at by gang members." P&A at 11-12. The

10  state court reasonably rejected petitioner's hyperbolic claims as not based on an accurate assessment

11  of the argument. Contrary to petitioner's assertion, the record demonstrates the prosecutor was not

12  comparing petitioner to mobsters or Klansmen. The prosecution was properly responding to defense

13  counsel's argument that petitioner should be acquitted because the victims in this case did not want

14  to be "saved" from petitioner. The state court explained:

15  > Defendant contends that defense counsel provided ineffective assistance by failing
   > to object when, during closing argument, the prosecutor allegedly asked the jury, as
16  > defendant characterizes his comments, "to hold defendant answerable for the general
   > problems of society."

18  > Responding to defense counsel's comment during closing argument that the case
   > featured "victims that don't want to be saved," the prosecutor in rebuttal provided his own
19  > theory for the victims' failure to come forward to identify their assailants, citing other
   > circumstances in which victims have been intimidated into silence: "[The victims] are
20  > saying where the criminals rule the neighborhood[,] where gangs are running, we live
   > under a blanket of fear, and we live under a blanket of silence. . . . [¶] It's very much like
   > in the deep south, when African-Americans were intimidated, cajoled, hurt violently into
21  > keeping silent to deny them the right to vote, to deny them their basic civil rights. . . . And
   > the people in the south did not say, 'We don't trust the system.' They said, 'The system
22  > cannot protect us.' . . . [¶] . . . [¶] You don't think it could still happen today? In
   > Chinatown in San Francisco to this very day, even two years ago during Chinese New
23  > Year . . . Chinese people give . . . each other red envelopes, fruit trees, oranges, tangerines
   > as a symbol of prosperity and good luck. And the mob in Chinatown would come with
24  > a kumquat plant and present it to the small business owners, and say, 'This is for the health
   > and prosperity of your business, and in return we would like a small donation.' Two years
25  > ago, two businesses in the Richmond District of San Francisco refused to give this
   > donation for their prosperity and their buildings were fired on and the businesses were
26  > burned. [¶] And law enforcement, both the federal government and San Francisco Police,
   > had a difficult time and continue to have a difficult time stamping out the Chinese mob.
27  > And it's not because the Chinese merchants say we do not trust the system, but it's
   > because they say, the system cannot protect us."

1    Defendant relies on a series of federal cases whose general teaching is that it is improper for a prosecutor to incite the "passions, fears and vulnerabilities of the jury"

2    (*United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149) by encouraging a guilty verdict in the service of some larger social purpose not directly related to the

3    defendant's guilt or innocence—for example, to "protect community values, preserve civil order, or deter future lawbreaking." (*United States v. Monaghan* (D.C. Cir. 1984) 741

4    F.2d 1434, 1441.) Accordingly, prosecutors have been criticized for referring to the "horror and outrage [felt] throughout this world" at the defendant's conduct (*United States*

5    *v. Koon* (9th Cir. 1994) 34 F.3d 1416, 1445) and for urging the jury to "tell [the defendant] and all of the other drug dealers like her . . . that we don't want that stuff in Northern

6    Kentucky." (*United States v. Solivan* (6th Cir. 1991) 937 F.2d 1146, 1148.)

7    The prosecutor's references to southern racists and Chinatown gangs did not constitute an improper appeal to passion and prejudice. The prosecutor did not suggest

8    that defendant's case or conduct were related to these other situations, nor that by convicting defendant the jury would in some way make a statement about conditions in

9    the South in the pre-civil rights movement era or in San Francisco's Chinatown. Instead, the prosecutor was attempting to answer the defense argument that the victims did not

10    want to have the crime prosecuted. In doing so, the prosecutor chose to analogize the fear engendered by the threat of gang retribution in Oakland to two other situations. The

11    analogy was not made for the purpose of inciting the jury to convict defendant but to explain the witnesses' conduct.[9] There was nothing improper in the prosecutor's

12    argument, and accordingly there was no basis for a claim of ineffective assistance in the failure to object. (E.g., *People v. Dickey, supra,* 35 Cal.4th at p. 915.)

13

14    Exh. 8 at 15-17 (footnote in original).

15    The state court's conclusion was not an unreasonable application of Supreme Court

16    precedent. *See Viereck v. United States,* 318 U.S. 236, 247-48 (1943). The state court reasonably

17    concluded that the prosecutor was not making "comments calculated to arouse the passions or the

18    prejudices of the jury." *United States v. Koon,* 34 F.3d 1416, 1443 (9th Cir. 1994), *rev'd on other*

19    *grounds* 518 U.S. 81 (1996). "An appeal to the jury to be the conscience of the community is not

20    impermissible unless it is 'specifically designed to inflame the jury.'" *Id.* at 1444; *United States v.*

21    *Leon-Reyes,* 177 F.3d 816, 822-23 (9th Cir. 1999). The state court reasonably reached the same

22    conclusion as in *Koon,* which held that

23    when the prosecutor's statement is considered in context, it is clear that it was not designed to inflame the jury, but rather to explain to jurors that they were in the position

24    to determine whether the charged conduct comported with community standards of

25

26    9. We also believe that the prosecutor's arguments were justified as a fair response to the closing argument of the defense. (See, e.g., *People v. Cunningham* (2001) 25 Cal.4th

27    926, 1026 [arguments by the prosecution that otherwise might be deemed improper do not constitute misconduct if they fall within the proper limit of rebuttal to arguments of defense

28    counsel].)

1    reasonableness.   The reference was not accompanied by any suggestion of the
     consequences of a particular verdict, nor did the prosecutor suggest to the jury that it had
2    a direct stake in the outcome of the case.   The comment did not cross the line
     "demarcating permissible oratorical flourish from impermissible comment calculated to
3    incite the jury against the accused."

4    *United States v. Koon*, 34 F.3d at 1444 (citations omitted). Likewise, the prosecution did not "point

5    to a particular crisis in our society and ask the jury to make a statement." *United States v.*

6    *Leon-Reyes*, 177 F.3d at 823.

7         Since the prosecution did not use the references to incite the jury nor urge the jury to

8    convict to cure societal ills, defense counsel's performance in withholding objection was not

9    constitutionally deficient. The state court's ruling was not an unreasonable application of *Strickland*.

10        Petitioner also cannot demonstrate prejudice.   Specifically, the references to southern

11   segregationists and Chinatown gangs was so far removed from the circumstances of the case that no

12   reasonable juror would be swayed to find guilt as a consequence. Moreover, the trial court instructed

13   the jury that it must not be influenced by prejudice, passion, sympathy, or public opinion, and

14   reminded jurors that arguments of counsel are not evidence. (6RT 858-59.) These factors militate

15   against any harm. *Allen v. Woodford*, 395 F.3d 979, 1016 (9th Cir. 2005) ("Again, however, this

16   reference [comparing petitioner to Adolf Hitler] did not render the penalty phase unfair.   The

17   reference to Hitler was pure argument. Moreover, the trial court admonished the jury not to consider

18   such statements as evidence. As explained in *United States v. North*, 910 F.2d 843 (per curiam),

19   withdrawn in part on other grounds, 920 F.2d 940 (D.C. Cir. 1990) (per curiam), '[t]o suspect that

20   the reference to Hitler swayed the jury on a close and critical issue would underestimate the common

21   sense that we properly attribute to the jury.'"); *see also United States v. Koon*, 34 F.3d at 1445

22   ("Such instructions dilute the potential prejudice arising from improper statements."). The remarks

23   represented an isolated portion of the rebuttal closing argument that were not repeated as part of

24   larger theme or pattern, and they were made in response to defense argument, lessening the potential

25   impact and providing context for the jury. *Koon*, 34 F.3d at 1445. Finally, as explained above, the

26   evidence against petitioner was overwhelming, in light of the identification of petitioner by Lache

27   Rodriguez, and her account, as confirmed by Holloway. Consequently, as in *Koon*, "the jury's ability

28   to weigh the evidence impartially was not materially affected by the prosecutor's improper remarks."

1    *Id.* at 1446.  Thus, there is no reasonable probability of a more favorable outcome had counsel

2    objected.

3    **C.    The State Court Reasonably Rejected Petitioner's Claim Of Ineffective
         Assistance Regarding Assertions Of Facts Not In Evidence During Argument**

4

5    Petitioner next contends that defense counsel was constitutionally ineffective for not

6    objecting to comments by the prosecution in closing which referred to facts outside the record.  The

7    state court's conclusion that defense counsel was not ineffective because he had tactical reasons for

8    withholding objection was not an unreasonable application of *Strickland*.  The state court explained:

9        Defendant contends that defense counsel provided ineffective assistance by failing
         to object on several occasions when, during closing argument, the prosecutor referred to
10       matters that were not part of the record.

11       First, at the outset of his closing, the prosecutor told the jury that "[s]tudies show"
         that persons who are the victims of trauma or violence are most likely to tell the truth
12       within the first 48 hours after the incident, the time during which L.R. had given a written
         statement to police identifying a "J-Rock."  The prosecutor claimed that victims of
13       shootings act much like victims of domestic violence in this regard, mitigating in their
         own mind the violence suffered after a fairly short time.  No expert testimony had been
14       presented to support these assertions.  Second, the prosecutor referred to the fact that
         Watts, after testifying to his nickname, sat with defendant's family members in the
15       audience.  Third, the prosecutor noted that when Holloway entered the courtroom, he
         looked exclusively at a group of people on the right side of the courtroom.  Finally, the
16       prosecutor referred to the "courtroom atmosphere," arguing that Holloway would not
         testify about the events in question, "not in here, not in these circumstances, not with the
17       courtroom atmosphere the way it was."[10]

18       It is improper for the prosecutor to refer in argument to facts outside the record unless
         they are either common knowledge or drawn from common experiences, history, or
19       literature. (*People v. Young* (2005) 34 Cal.4th 1149, 1197; *People v. Cunningham, supra,*
         25 Cal.4th at p. 1026.)  The prosecutor's characterization of the results of scientific
20       studies, his claims about the truth-telling conduct of victims of trauma, and his application
         of those purported principles to L.R. were unsupported by the record.  We do not agree
21       with the Attorney General that the studies are matters of common knowledge or that the
         prosecutor's observations were drawn from common experiences.  It was improper for the
22       prosecutor to make this argument without some support in the evidence presented at trial.

23       Nonetheless, we cannot say that there is no satisfactory explanation for the failure of
         defense counsel to object to the argument.  The prosecutor's improper comments were,
24       as defendant characterizes them, "psychobabble," and as such were both unpersuasive and
         counterproductive to the prosecution.  His argument actually detracted from a more
25       credible explanation of L.R.'s conduct that was fully supported by the record-not that she

26   _____

27       10.  Apparently nine people were present in the courtroom during Holloway's
         testimony. The prosecutor suggested during examination and argument that they were
28       present to intimidate Holloway during his testimony.

recanted because she came to justify the violence to herself, as a victim of domestic violence might, but that she recanted because she realized that publicly testifying about the truth exposed her to violent retribution. Defense counsel could very well have elected not to object to the remarks because they weakened the prosecution's case, rather than supported it.

For similar reasons, we find no reasonable probability that, but for the failure to object, the result of the proceeding would have been different. (*People v. Davis, supra,* 36 Cal.4th at p. 551.) Given the evidence of L.R.'s genuine fear, the prosecutor's argument was implausible and likely had no influence on the jury's conclusions.

The remaining three examples of claimed misconduct cited by defendant present a closer question. Each was a reference by the prosecutor to events occurring in the courtroom that were not part of the official record because they did not constitute testimony or evidence. While it is true that prosecutors are generally prohibited from referring to evidence outside the record, the prohibition is intended to preclude prosecutors from suggesting that there is additional evidence that the jury has not heard that supports conviction. Allusions to events that the jury could observe inside the courtroom, whether or not part of the official record, do not constitute this type of suggestion. Whether a witness conducted himself or herself in a particular manner in the courtroom, or whether the courtroom had a particular "atmosphere," are assertions that the jurors were able to evaluate for themselves on the basis of their own observations.[11] On the other hand, because the jurors' attention was not specifically directed to these events when they occurred—for example, by a prosecutor's request that the "record reflect" the events—there is no guarantee that the jury actually witnessed them. Moreover, the inference of witness intimidation that the prosecutor sought to draw from these events was not based on any actual evidence of the motives of those present but was simple speculation, as was the assertion that the courtroom had a particular "atmosphere." Defendant's claim that these references constituted misconduct is therefore plausible.

We need not resolve the issue of misconduct, however, because neither of the two references to which counsel did not object could support a claim of ineffective assistance of counsel.[12] First, defendant has not demonstrated that there was no satisfactory explanation for counsel's failure to object. Given the nature of the conduct alluded to by the prosecutor, it is possible that defense counsel refrained from objecting simply to avoid calling additional attention to the courtroom events. (See *People v. Huggins, supra,* 38 Cal.4th at p. 206.)

Further, it is not "reasonably probable that a result more favorable to the defendant would have been reached" in the absence of the misconduct. (*People v. Crew, supra,* 31 Cal.4th at p. 839 .) The jury was presented with a credible identification of defendant by L.R., who was directly involved in the shooting, knew defendant by name, and picked his photograph from a photo lineup soon after the incident. Although L.R. recanted her identification on the stand, the evidence was strong that she recanted solely from fear of gang retribution. While defendant presented alibi testimony, the credibility of that testimony, provided by his sister, was seriously compromised because it did not emerge

---

11. The jury was properly instructed that statements of counsel were not to be considered evidence.

12. In addition, defense counsel did object to the prosecutor's reference to Watts's sitting with defendant's family members. There is therefore no basis for a claim of ineffective assistance as to this incident.

1 | until the day before it was presented. The evidence supporting conviction was therefore
2 | reasonably strong. The prosecutor's references to matters occurring in the courtroom did
not bear directly on this evidence but were intended to bolster the prosecution's claim that
witnesses, particularly Holloway, were afraid to testify truthfully. Because the evidence
3 | supporting that claim, most prominently L.R.'s own vehement expressions of fear at the
time she made the identification, was already strong, there is no reason to think that the
4 | absence of the prosecutor's references would have led to a different result.

5 | Exh. 8 at 17-20 (footnotes in original).

6 | The state court's findings that defense counsel had tactical reasons for withholding

7 | objection are not unreasonable and have not been rebutted by clear and convincing evidence. Indeed,

8 | with respect to the comments about the courtroom atmosphere during James Holloway's testimony

9 | the record reflects that defense counsel made a tactical decision to take on the prosecutor's

10 | comments in closing and attempt to turn them to his advantage, rather than object to them. Defense

11 | counsel responded to the argument by asserting that the additional observers came with Holloway,

12 | and by suggesting to the jury that Holloway, a convicted drug dealer, would not be intimidated by

13 | anyone. (6RT 814-16.) Moreover, counsel was well aware that he too intended to reference events

14 | that occurred after a witness left the witness chair. He pointed out that Lache Rodriguez was crying

15 | as she was leaving the courtroom after testifying to argue that she cries for effect. (6 RT 822.) Had

16 | defense counsel objected to the prosecution's comments relating to events in the courtroom away

17 | from the witness stand, he would likely have been precluded from making his point as well.

18 | Petitioner also makes a passing reference, without record citation, to two additional claims

19 | of alleged facts not in evidence, namely "a hypothetical conversation in which unidentified persons

20 | spoke to Holloway after his testimony and praised him for not 'snitching,'" and "argument that

21 | Holloway would have implicated petitioner in the shooting if he had testified truthfully." P&A at

22 | 11. Neither of these points were raised in petitioner's direct appeal, and consequently, were not

23 | fairly presented to the California Supreme Court. Cal. R. Ct., Rule 8.8500(c)(1); *People v. Cookson*,

24 | 54 Cal. 3d at 1100; *People v. Bransford*, 8 Cal. 4th at 893, n.10; *Gatlin v. Madding*, 189 F.3d at 887-

25 | 89. For the reasons already discussed above, these assertions are not exhausted and therefore cannot

26 | serve as a basis for granting relief. Moreover, the claims are unavailing.

27 | Specifically, defense counsel had no reason for objecting because the statements by the

28 | prosecution were proper comments on the state of the evidence. Holloway testified extensively on

1    direct examination about the consequences for being a "snitch." (4RT 519-20.) He acknowledged

2    that answering the prosecution's questions about what happened on the night of the incident would

3    be considered snitching, and he explained that he was not going to be a snitch. (4RT 520.) He then

4    proceeded to deny any knowledge of the shooting.  When asked, "If you knew J Rock was the

5    shooter on October 12th, 2002, would you tell us today?", Holloway responded, "Hell no.  That

6    would be a snitch." (4RT 524.)  Holloway was then impeached with his preliminary hearing

7    testimony.   (4RT 528-61.)   In his preliminary hearing testimony, Holloway had similarly

8    acknowledged when asked, "even if you knew it was J Rock, you still wouldn't tell us?", "No I

9    wouldn't." (4RT 561.) Accordingly, the prosecution could readily draw the inference from Lache

10   Rodriguez's statements that Holloway in fact knew petitioner was the shooter, and could draw the

11   inference from Holloway's testimony that the reason he was not identifying petitioner as the shooter

12   was because he was not going to be a snitch.  The prosecution's comments permissibly flowed

13   directly from those inferences. (6RT 780, 845.) Counsel was not deficient for not objecting, given

14   that an objection would have been unavailing in light of the testimony.

15          The state court's conclusion that petitioner failed to demonstrate prejudice was also a

16   reasonable application of *Strickland*.  As the state court found, Lache Rodriguez presented a strong

17   identification of petitioner to the police, and her subsequent recantation was dubious at best.

18   Petitioner's 11th hour alibi evidence lacked credibility.   Accordingly, there was no reasonable

19   probability of a more favorable outcome had defense counsel objected. Exh. 8 at 18-20.

20          **D.   No Ineffective Assistance Regarding Alleged Burden-Shifting During Argument**

21          Petitioner includes in his Summary of Claims for Relief a claim that defense counsel was

22   ineffective for failing to object to the prosecution's "closing argument stating that if the jury

23   disbelieved the petitioner's alibi witnesses, it would have to convict petitioner." Pet. at 10-11 (claim

24   h).[13]  The state court's rejection of it was not an unreasonable application of *Strickland*. The state

25   court explained:

26

27   ───────────────────────────────

        13. Petitioner does not develop the factual or legal basis for this claim anywhere in his points

28   and authorities. This claim, however, was presented below and rejected by the state court.

1    Defendant contends that defense counsel provided ineffective assistance by failing to object when, during closing argument, the prosecutor purportedly misrepresented the

2    law governing the burden of proof. In discussing defendant's alibi testimony, the prosecutor said, "[O]nce the defense has raised it, you see, they don't get a free swing at

3    the carnival and then get to say that well, I took my shot and here is what I want you to believe.... But if you don't believe that, let me give you some other things. Don't let the

4    defense get away with that. [¶] If the defense raises an alibi, and you reject it as unreasonable, don't let them use what I call the shotgun defense. Saying, well, if you

5    don't buy that, you can also buy other reasons.... Ladies and gentlemen, if you don't buy into the defense alibi, the defense theory . . . then consider that the only true reasonable

6    explanation is the one that has been presented to you, that ... he was the shooter. And the defense had to raise the defense, because they knew that we've proven our case beyond

7    a reasonable doubt.... I urge you, ladies and gentlemen, reject that reason; reject those arguments. Hold them to the defense that they raised, that they raised on their own and

8    reject it. And see that the only reasonable explanation is the one that has been presented by the prosecution."

9

10    Although a prosecutor may not comment upon the failure of a defendant to testify (*Griffin v. California* (1965) 380 U.S. 609), this does not prevent a prosecutor from commenting upon the state of the evidence, or on the failure of the defense to introduce

11    material evidence or to call logical witnesses. (*People v. Cornwell* (2005) 37 Cal.4th 50, 90.)Once the prosecutor has submitted proof that permits a finding of guilt beyond a

12    reasonable doubt, the accused risks conviction if he or she does not respond with evidence that "'raises' or permits a reasonable doubt." (*People v. Gonzalez* (1990) 51 Cal.3d 1179,

13    1215, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) In these circumstances, the argument that the defense did not present

14    persuasive responsive evidence does not suggest that the defendant had a formal burden of proof that he or she failed to carry.[14] (*People v. Ratliff* (1986) 41 Cal.3d 675, 691.)

15

16    Defendant relies on *Hill, supra,* 17 Cal.4th 800, in which the prosecutor argued to the jury it must find "some evidence" on which to base a reasonable doubt in order to acquit.

17    (*Id.* at p. 831.) The court recognized that the statement was ambiguous, amenable both to an innocent interpretation and to the interpretation that the jury must base its acquittal

18    on affirmative evidence, rather than merely an absence of persuasive evidence. (*Id.* at pp. 831-831.) Because the court concluded that it was "reasonably likely" that the jury

19    understood the comments in the manner that constituted a misstatement of the law, the court found misconduct. (*Id.* at p. 832.)

20    Defendant summarizes the prosecutor's argument as "if the jury rejects [defendant's] alibi defense it must find him guilty." While the prosecutor's comments were poorly

21    phrased, we do not believe that it is reasonably likely that the jurors understood them in the manner urged by defendant. While it is true that at the beginning the prosecutor used

22    mandatory language, stating that "they don't get a free swing," the remainder of his argument used language recognizing that the jury was required to use its judgment in

23    evaluating the evidence: "Don't let the defense get away with that"; "consider that the only true reasonable explanation is the one that has been presented to you"; "[h]old them

24    to the defense that they raised." Taking the prosecutor's argument as a whole, we conclude that it is not reasonably likely that the jurors understood him to suggest that they

25    were required to convict if they found the alibi testimony to be false. The more likely interpretation was, as the prosecutor summed up his argument, the jury should "see that

26

27

28    14. On the contrary, the prosecutor expressly acknowledged his own burden of proof beyond a reasonable doubt in his rebuttal.

1   the only reasonable explanation is the one that has been presented by the prosecution."
2   As in *People v. Boyette, supra,* 29 Cal.4th at page 434, the "prosecutor's argument was
    that defendant's version of events was *less believable. . .* , not that the jury was *legally*
3   *prohibited* from crediting his testimony . . . , or that he had failed to meet a burden of
    proof." Because it was not likely that the jury misinterpreted the prosecutor's comments
    in the manner suggested by defendant, we find no deficiency in counsel's failure to object.
4   (E.g., *People v. Dickey, supra,* 35 Cal.4th at p. 915.)

5   Exh. 8 at 20-22 (footnote in original).

6           The state court's ruling was not an unreasonable application of Supreme Court precedent.

7   *See Donnelly v. DeChristoforo,* 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that

8   a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting

9   through a lengthy exhortation, will draw that meaning from the plethora of less damaging

10  interpretations.").

11          In this case, the prosecution prefaced its remarks about the alibi defense by explicitly

12  reminding the jury that the prosecution always bore the burden of proof. The prosecution began,

13  "The defense decided to raise an alibi defense. They put on alibi witnesses. Now, the burden always

14  rests with the People to prove the case beyond a reasonable doubt, and the burden never moves from

15  the People. And from the evidence presented, when we presented our evidence, there is enough

16  evidence definitely beyond any reasonable doubt to convict the defendant." (6RT 781.) The

17  prosecution then explained why nothing presented by the defense undermined the prosecution's case

18  which had been proven beyond a reasonable doubt. (6RT 781-85.) The prosecution concluded by

19  urging the jury to find the defense evidence unreasonable. "I urge you, ladies and gentlemen, reject

20  that reason; reject those arguments. Hold them to the defense that they raised, that they raised on

21  their own and reject it. And see that the only reasonable explanation is the one that has been

22  presented by the prosecution." (6RT 785.) The state court's finding that there was no reasonable

23  likelihood that the jury would understand these arguments as shifting or diminishing the burden of

24  proof was not an unreasonable application of Supreme Court precedent. And the state court's

25  conclusion that counsel's performance was not deficient for declining to object to an argument that

26  was not legally incorrect was likewise a reasonable application of Supreme Court precedent.

27  Moreover, because the prosecution's argument was not misconduct, petitioner cannot demonstrate

28  prejudice from the failure to object.

1    **E.    No Prejudice For Any And All Of Petitioner's Ineffective Assistance Of Counsel
       Claims**

2

3        Finally, the state court's finding of no prejudice as to one of petitioner's claims of

4    ineffective assistance is equally applicable to all of his claims. The court observed that "[t]he jury

5    was presented with a credible identification of defendant by L.R., who was directly involved in the

6    shooting, knew defendant by name, and picked his photograph from a photo lineup soon after the

7    incident. Although L.R. recanted her identification on the stand, the evidence was strong that she

8    recanted solely from fear of gang retribution. While defendant presented alibi testimony, the

9    credibility of that testimony, provided by his sister, was seriously compromised because it did not

10   emerge until the day before it was presented. The evidence supporting conviction was therefore

11   reasonably strong." Exh. 8 at 20.

12       As detailed above, the specific claims of evidentiary error and prosecutorial misconduct

13   implicated collateral matters that did not impact the strength of the prosecution's case or the

14   defense's alibi. There is no reasonable probability that had defense counsel objected to the claimed

15   errors, petitioner would have received a more favorable result. *Strickland v. Washington*, 466 U.S.

16   at 693-96. For this reason, petitioner's claim of cumulative error also fails.

17                                                **III.**

18                         **NO PLAIN ERROR REVIEW UNDER CALIFORNIA LAW**

19       Petitioner's final contention is that, even though defense counsel did not object to any of

20   the above claims of error, "[t]he errors also constituted 'plain error' under California law, rendering

21   them cognizable even in the absence of a showing of ineffectiveness." Pet. at 11. The state court

22   rejected this claim, explaining that California does not have a plain error rule.

23       The doctrine of plain error, adopted in the federal courts, has been rejected by the
     California Supreme Court. In *People v. Benavides* (2005) 35 Cal.4th 69 (*Benavides*), the

24   court was asked to address purported errors to which no objection had been made at trial.
     The court rejected the invitation: "[D]efendant urges us to adopt a rule of 'plain error

25   review' in capital cases whereby we would reach the merits of otherwise forfeited or
     waived claims of error. We have previously rejected such suggestions. (See *People v.*

26   *Wash* (1993) 6 Cal.4th 215, 276-279 (conc. & dis. opn. of Mosk, J.).)" (*Benavides*, at p.
     115.) The concurring and dissenting opinion by Justice Mosk cited by the court as

27   evidence of its prior *rejection* of the plain error rule is the primary opinion on which
     defendant relies to *support* his contention that we should undertake plain error review. It

28   can only be concluded that *Benavides* constitutes an unequivocal rejection by the court of

1  the position taken by Justice Mosk in his concurring and dissenting opinion—and a similar
2  rejection of defendant's argument.

3  Exh. 8 at 5-6. Thus, the state court found the failure to object waived the underlying claims of error,

4  rendering them not cognizable on direct review. Exh. 8 at 5 ("Defendant's opening brief discusses

5  a number of purported irregularities at trial. Because none of these was subject to objection, any

6  claims of error on appeal have been waived.").

7  Not only is petitioner's claim contrary to state law, it is unexhausted because petitioner did

8  not include his "plain error" claim in his petition for review. Exh. 8. Accordingly, this court may

9  only reach the claim to reject it on the merits. 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d

10  at 624.

11  ## IV.

12  ## PETITIONER HAS NOT MET HIS BURDEN OF ESTABLISHING THE
13  ## NEED FOR AN EVIDENTIARY HEARING

14  Petitioner also requests an evidentiary hearing. However, he has not met his burden of

15  establishing the need for an evidentiary hearing to resolve his claims. The general rule is that to

16  obtain an evidentiary hearing on a Sixth Amendment claim, "a petitioner must establish that his

17  allegation of ineffective assistance, if proven, would establish both deficient performance and

18  prejudice." *Babbitt v. Calderon*, 151 F.3d 1170, 1177 (9th Cir. 1998); *Pizzuto v. Arave*, 280 F.3d

19  949, 973 (9th Cir. 2002). Thus, when the trial record establishes the absence of either *Strickland*

20  prong, an evidentiary hearing is unwarranted. "It is axiomatic that when issues can be resolved with

21  reference to the state court record, an evidentiary hearing becomes nothing more than a futile

22  exercise. *Totten v. Merkle*, 137 F.3d 1172, 1175-76 (9th Cir. 1998).

23  Petitioner argues in support of his request for an evidentiary hearing that "any attempt by

24  respondent to propose 'legitimate tactical reasons' for defense counsel's acts and omissions that are

25  not based on evidence that counsel actually relied on such reasons would be insufficient to raise a

26  material evidentiary dispute concerning the issue." P&A at 15. He asserts that "[i]f respondent

27  presents no 'facts', petitioner contends that this court would have to conclude that defense counsel

28  had no legitimate tactical reasons for his acts and omissions." P&A at 15. Petitioner's contentions

1    ignore the procedural posture of the case.

2        The California Court of Appeal already found legitimate tactical reasons for defense

3    counsel's actions based on the record of the trial court proceedings. Those findings, whether express

4    or implied, are entitled to a presumption of correctness. *Sumner v. Mata*, 449 U.S. at 546-47. On

5    federal habeas, petitioner bears the burden of rebutting the state court's express and implied findings

6    by clear and convincing evidence, 28 U.S.C. § 2254(e)(1); *Marshall v. Lonberger*, 459 U.S. at 431-

7    36, and he bears the burden of demonstrating that the state court's rulings based on those factual

8    determinations were unreasonable to merit habeas relief, 28 U.S.C. § 2254(d)(2); *Garvin v. Farmon*,

9    258 F.3d at 957; *Torres v. Prunty*, 223 F.3d at 1108.

10        Here, the state court made both express and implied findings of tactical reasons for defense

11    counsel's actions, that were patent or inferred from the record of the trial proceedings. Petitioner

12    has failed to rebut those findings by clear and convincing evidence. Thus, the issue can be resolved

13    by reference to the state court record. Furthermore, the state court concluded, based on the trial

14    record, that petitioner had failed to demonstrate prejudice. Thus, an evidentiary hearing is

15    unnecessary because petitioner was not prejudiced by the alleged deficient performance. *Totten*, 137

16    F.3d at 1175-76.

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24

25

26

27

28

1    **CONCLUSION**

2        Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

3    be denied.

4        Dated:  September 2, 2008

5                                Respectfully submitted,

6                                EDMUND G. BROWN JR.
                                 Attorney General of the State of California

7                                DANE R. GILLETTE
                                 Chief Assistant Attorney General
8
                                 GERALD A. ENGLER
9                                Senior Assistant Attorney General

10                               GREGORY A. OTT
                                 Deputy Attorney General

11
                                 /s/  Jeffrey M. Laurence
12
                                 JEFFREY M. LAURENCE
13                               Deputy Attorney General

                                 Attorneys for Respondent
14
     JML:jw
15   20137958.wpd

16

17

18

19

20

21

22

23

24

25

26

27

28